**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————————

| | |
|---|---|
| **DEBRA LYNNE LEAHY** *et al.,* ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | **Civil No. 05-1135** |
| **v.** ) | **Judge Paul L. Friedman** |
| ) | |
| **THE UNITED STATES DEPARTMENT** ) | |
| **OF AGRICULTURE,** *et al.,* ) | |
| ) | |
| *Defendants,* ) | |
| ) | |
| **and** ) | |
| ) | |
| **JOHN F. CUNEO, JR., and** ) | |
| **THE HAWTHORN CORPORATION,** ) | |
| ) | |
| ) | |
| *Defendants-Intervenors.* ) | |

———————————————————————————

**DEFENDANTS-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

Derek L. Shaffer
Vincent J. Colatriano
Michael Weitzner
COOPER & KIRK, PLLC
1500 K St., N.W., Suite 200
Washington, D.C. 20005
(202) 220-9600

June 15, 2005

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ........................................................................................ 1

BACKGROUND ......................................................................................... 4

    A.    Course Of Proceedings.................................................................. . 4

    B.    Statement Of Facts ...................................................................... 11

ARGUMENT ............................................................................................. 15

    A.    Plaintiffs Lack Standing.............................................................. 16

        1.    Plaintiffs Have No "Injury in Fact"
            That Is "Redressable" ...................................................... 17

        2.    Plaintiffs Are Outside the
            Relevant "Zone of Interests"........................................... 23

    B.    Plaintiffs Cannot Succeed On The Merits................................... . 24

        1.    The Approval Decision Is Committed
            to Agency Discretion ...................................................... 25

        2.    USDA's Approval Decision Is Amply Justified........... 28

    C.    Plaintiffs Lack Irreparable Harm................................................. 32

    D.    Defendants-Intervenors Suffer Harm
        Each Day Placements Are Delayed. ........................................... 34

    E.    The Public Interest Weighs In Favor
        Of Letting Placements Proceed.................................................. 35

CONCLUSION............................................................................................ 36

# TABLE OF AUTHORITIES

<u>Page</u>

*Amax Land Co. v. Quarterman*, 181 F.3d 1356
(D.C. Cir. 1999) ................................................................................    31

*American Library Ass'n v. FCC*,  No. 04-1037,
406 F.3d 689, 2005 U.S. App. LEXIS 7847 (D.C. Cir. May 6, 2005) .............    22

*\* American Society for the Prevention of Cruelty to Animals v.*
*Ringling Bros. & Barnum & Bailey Circus*,
317 F.3d 334 (D.C. Cir. 2003) .........................................................    17, 21,
                                                                                          22

*Animal Legal Def. Fund v. Espy*, 23 F.3d 496 (D.C. Cir. 1994)......................    22, 23

*\* Animal Legal Defense Fund v. Glickman*,
154 F.3d 426 (D.C. Cir. 1998) (en banc) ........................................................    17, 20, 23,
                                                                                          25

*Auer v. Robbins*, 519 U.S. 452 (1997) ...............................................................    28

*Chevron v. NRDC*, 467 U.S. 837 (1984)............................................................    28

*Fund for Aminals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998)............................    33

*Fund for Animals v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) ............................    33

*Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003).....................    33

*\* Heckler v. Chaney*, 470 U.S. 821 (1985) .......................................................    25

*Independent Bankers Ass'n v. Heimann*, 627 F.2d 486 (D.C. Cir. 1980)..........    35

*In re Far West Meats*, 55 Agric. Dec. 1033 (J.O. 1996)...................................    28

*International Primate Prot. League v. Institute for Behavioral Research*,
799 F.2d 934 (4th Cir. 1986) ...........................................................................    23

*\* Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................    17

*Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410 (D.C. Cir. 1998)...........    23

Page

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)....................................................................................... 31

*Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir. 1996) ............................... 17

*Rust v. Sullivan*, 500 U.S. 173 (1991) ............................................................ 31

*Treadaway v. Academy of Motion Picture Arts & Scis.*,
783 F.2d 1418 (9th Cir. 1986) ........................................................................ 27

*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998)........................ 15, 16

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1997) ........................................................................ 15

**STATUTES**

5 U.S.C. § 706(2) ............................................................................................. 3, 26

7 U.S.C. § 2132(h) ........................................................................................... 2, 29

9 C.F.R. § 1.1. .................................................................................................. 2, 29

In accordance with Local Rule 65.1(c) and this Court's Order of June 10, 2005,

Defendants-Intervenors' John F. Cuneo, Jr., and the Hawthorn Corporation ("Defendants-

Intervenors"), hereby respectfully oppose Plaintiffs' Motion for a Temporary Restraining

Order, filed June 8, 2005, as thereafter converted by consent into a Motion for a

Preliminary Injunction.

## INTRODUCTION

On the eve of transportation of elephants that Plaintiffs do not own, pursuant to an

administrative consent decision to which they are not party, Plaintiffs have filed suit

because they do not like the elephants' set destination – namely, the Endangered Ark

Foundation ("EAF") in Hugo, Oklahoma – and would prefer that they be routed

someplace else – namely, the Elephant Sanctuary ("TES"), in Hohenwald, Tennessee.[1]

Plaintiffs' preference is not grounded in law; as their papers make clear, it stems from

their radical ideology of "animal rights," whereby anomalous facilities that generally

eschew breeding and human contact for elephants, such as TES, are revered, and

mainstream facilities that generally embrace them, such as EAF,[2] are reviled.  Whatever

the merits of Plaintiffs' own policy preference, it finds no place in the statute or

regulations that the Defendant United States Department of Agriculture ("USDA") is

sworn to superintend.  Far from *proscribing* use of animals "to entertain people,"

---

[1] Astonishingly, Plaintiffs fail to inform the Court that TES has consistently maintained that it cannot and will not accept any additional elephants at present; and will not be prepared to do so until September at the earliest.  *See* Letter from M. Stagg to D. Shaffer dated Mar. 3, 2005 (attached as Exhibit 14) at 1.

[2] Although Plaintiffs continually conflate EAF and the Carson & Barnes Circus, the two are distinct.  EAF is a habitat for elephants, only some of which are at times exhibited in Carson & Barnes.  With respect to the elephants in question, however, it has been specifically agreed, pursuant to USDA's approval decision, that they will *not* be used in Carson & Barnes.

Plaintiffs' Memorandum in Support of Their Motion for a Temporary Restraining Order ("Pls. Mem.") at 15, the governing law expressly sanctions it. *See, e.g.*, 7 U.S.C. § 2132(h) (defining a regulated "exhibitor" as "any person . . . exhibiting any animals . . . to the public for compensation," including "carnivals, circuses, and zoos"); 9 C.F.R. § 1.1. Thus, circuses like Carson & Barnes continue to employ animal acts as they have for many decades consistent with USDA regulation and oversight, spreading enjoyment and animal appreciation in the process, with full approval from the United States' democratically-elected lawmakers and public. If Plaintiffs now desire legislative change, they may pursue it. But they have no warrant for urging their radical, anti-circus agenda upon USDA, let alone for having it judicially imposed by way of this administrative challenge.

Plaintiffs' claimed entitlement to relief from this Court is not even colorable. Most fundamentally, Plaintiffs have no standing under Article III, for they are relative strangers to these elephants – each of which is the private property of Defendants-Intervenors – and have no more connection to them than might any admiring member of the general public. Nor do Plaintiffs have prudential standing, for they are likewise strangers to the provisions of the administrative consent decision, negotiated and agreed to by USDA and Defendants-Intervenors, that would purportedly ground their challenge. Even accepting Plaintiffs' entire theory of this case, they do not come before this Court with a live case or controversy, for the relevant donative agreements have *already been executed* (with USDA's approval) between EAF and Defendants-Intervenors – and Plaintiffs' APA challenge is now wholly beside the point with respect to those private agreements.

Assuming, *arguendo*, that the merits might nonetheless be reached, Plaintiffs have no basis whatever for challenging USDA's considered approval of EAF as a facility that indeed complies "with the [Animal Welfare] Act and the Regulations," just as the consent decision contemplates and Carson & Barnes' operative exhibitor's license (which has never been revoked and Plaintiffs find no fault with) reflects. There is one and only one argument that Plaintiffs can even articulate under the APA, 5 U.S.C. § 706(2) – namely, that USDA's decision to approve EAF as a qualified donee facility under the consent decision constitutes an unjustified departure from USDA's prior refusal to do so. But that is a surefire loser: the instance in which USDA previously declined to approve EAF as a donee occurred a year ago, in April 2004, under vastly different circumstances. During the intervening year,

> (i)    USDA's investigation of Carson & Barnes that had been ongoing in April 2004 ultimately concluded to USDA's satisfaction;
>
> (ii)    Defendants-Intervenors specifically proposed these four elephants as appropriate for EAF;
>
> (iii)    EAF arranged and proposed for a separate structure to house these elephants;
>
> (iv)    these elephants successfully completed an eighteen-month period of negative tuberculosis tests, further ameliorating possible tuberculosis concerns;
>
> (v)    other potential donees, including Plaintiffs' preferred donee, TES, proved unable or unwilling to receive the elephants; and
>
> (vi)    the Chief Administrative Law Judge who oversees the consent decision granted a stay of the donative deadline in response to Defendants-Intervenors' contentions that USDA was unreasonably withholding its approval, and then urged the parties to work more cooperatively and flexibly toward agreed-upon placements.

As such, USDA had every good reason here to arrive at a different approval decision in April 2005 than it had in April 2004, and its approval of EAF can by no means be called arbitrary and capricious.

Nor do the equities favor Plaintiffs' request for a preliminary injunction. Their challenge comes late, weeks after they learned USDA had approved donations of the elephants and after the private donative agreements had been executed between Defendants-Intervenors and EAF. All an injunction might halt at this point is actual transportation of the elephants from Hawthorn to EAF, a trip no different from countless ones the elephants have taken during their lives with the circus. On the other side of the scale are concrete costs of ongoing care and rearranging logistics that Defendants-Intervenors face to the extent transport is further delayed. Therefore, separate and apart from the merits, Plaintiffs' case for a preliminary injunction is paltry.

Everything else Plaintiffs say in their papers, their diatribes against Defendants-Intervenors and EAF, and their rhapsodies in favor of TES, reflects a spillover of public propagandizing into federal court. Their polemical account of the relevant facts and facilities cannot satisfy the Federal Rules of Evidence or, indeed, meaningful scrutiny of any kind.

## BACKGROUND

### A.    Course Of Proceedings.

The placements at issue arise from an administrative consent decision ("Order") between USDA and Defendants-Intervenors. In April 2003, USDA brought an enforcement action against Defendants-Intervenors for alleged violations of the AWA and regulations. The action was ultimately resolved in March 2004 by way of the

4

consent decision negotiated and agreed to by the parties, and then entered by the presiding judge, Marc R. Hillson, USDA's Chief Administrative Law Judge ("ALJ").  By the terms of this consent decision, Defendants-Intervenors are to "place all of their elephants,[3] by donation, with persons who have demonstrated the ability to provide proper care for said animals in accordance with the [AWA] and the Regulations, and whom [USDA] has previously approved as donees."  Order at ¶3 (attached as Exhibit 7).  In addition, the parties are to "work cooperatively to effectuate donations . . . as swiftly as possible."  Order at ¶5 (Exhibit 7).  The initial deadline specified for donations to be completed was "August 15, 2004," though the parties specifically "agree[d] to renegotiate the deadline" if the elephants – two of which, not at issue here, had tested positive for tuberculosis according to USDA – could not be placed by that date because of concerns about possible tuberculosis.  Order at ¶6 (Exhibit 7).

The parties' initial efforts to effectuate the terms of the consent decision engendered dispute between them.  From March through August of 2004, Defendants-Intervenors proposed various facilities (typically zoos, circuses, and other facilities that permit breeding and public visitation) that USDA declined to approve as donees.  On March 23, 2004 Defendants-Intervenors' counsel[4] initially proposed EAF as a donee via voicemail to USDA's counsel.  *See* Letter from B. Juarez to B. Boley dated Mar. 24, 2004 (attached as Exhibit 11).  On April 30, 2004, little more than a month later, USDA stated via letter that it declined to approve "Endangered Ark Foundation (Carson &

---

[3] At the time of the consent decision, the herd of elephants numbered 16.  Three of the elephants have since been placed, and another has passed away of old age.

[4] Defendants-Intervenors counsel at that time differs from the undersigned, who first assumed this representation in June 2004.

Barnes Circus)." Letter from B. Juarez to B. Boley dated Apr. 30, 2004 (Verified

Complaint Ex. C). During the ensuing exchange about EAF and other donees that had

been proposed, USDA's counsel mentioned to Defendants-Intervenors' counsel, in a

letter dated May 21, 2004, "the very real possibility that the Elephant Sanctuary and

PAWS[, the President of which is Pat Derby, whose affidavit accompanies Plaintiffs'

Motion and attests that her facility parallels TES in opposing breeding and human contact

for elephants, *see* Pls. Mem. Ex. 3 at ¶4] would be the only facilities that met the

requirements of the Consent Decision and Order . . . by August 15, 2004." Letter from B.

Juarez to B. Boley dated May 21, 2004 (Verified Complaint Ex. D). Although USDA

viewed this position as consistent with discussions preceding entry of the consent

decision, Defendants-Intervenors expressed a differing view about both the requirements

of the consent decision and the prior discussions surrounding it.

When this disagreement (along with several others) persisted and donations of the

herd could not be agreed upon, Defendants-Intervenors in July 2004 moved Chief Judge

Hillson to stay the August 15 deadline on an emergency basis, arguing that USDA had

impeded donations by failing to comply with its obligations under the consent decision;

in August, Defendants-Intervenors also moved Chief Judge Hillson in the alternative to

vacate the consent decision on various grounds, including that USDA's obligation to

approve donations and cooperate in good faith might prove illusory.[5] Chief Judge

Hillson on August 13 granted an emergency stay pending his adjudication of Defendants-

Intervenors' motions following an evidentiary hearing that he proposed to set. *See* Stay

---

[5] While awaiting a stay decision from Chief Judge Hillson, Defendants-
Intervenors also filed for a temporary restraining order in the Northern District of Illinois
on the eve of the donative deadline; that action was effectively mooted by the ensuing
grant of an administrative stay.

Order dated Aug. 13, 2004 (attached as Exhibit 8).  USDA immediately appealed the stay

to the Judicial Officer (who reviews ALJ decisions), but that appeal was dismissed in

November 2004 for lack of jurisdiction, whereupon the case was remanded back to Chief

Judge Hillson.  *See* J.O. Order Dismissing Complainant's Appeal dated Nov. 22, 2004

(attached as Exhibit 9).  Pursuant to their respective roles, both Chief Judge Hillson and

the Judicial Officer urged the parties to attempt to resolve their differences by working

together to agree upon placements of the remaining Hawthorn elephants.

Since then, the parties have indeed arrived at a more cooperative and constructive

approach to the donation process.  As a result, the stay and Defendants-Intervenors'

motions have remained pending before Chief Judge Hillson, with all agreeing that there is

no need for further adjudication so long as the parties continue to work together

productively.  The parties maintain a shared commitment to completing the donation

process "as swiftly as possible," just as the consent decision requires.  Order at ¶5

(Exhibit 7).  Chief Judge Hillson likewise shares that commitment, continuing to

superintend the consent decision and donation process and to hold status conferences on

approximately a bi-monthly basis.  *See* Orders memorializing status conferences

(attached as Exhibit 10).

To date, three members of the Hawthorn herd have actually been placed with

donee facilities.  One, Judy, was donated and placed shortly following entry of the

consent decision, with approval from USDA.  Two other members of the Hawthorn herd,

Misty and Lota, which, according to USDA, have tested positive for tuberculosis,[6] were

---

[6] The status and validity of Misty's positive test for tuberculosis has been a matter
of some dispute between Defendants-Intervenors and USDA, but is irrelevant for present
purposes.

donated to TES shortly before the stay (again, with USDA's approval), and then transported to TES in November, after health concerns raised by Tennessee authorities had been addressed.[7]

In addition, Defendants-Intervenors and USDA earlier this year agreed to explore donating the remainder of the Hawthorn herd to TES. That prospect, however, fell through when TES in February requested financial assistance (on the order of $125,000 per elephant, per year) from Defendants-Intervenors as a term for the donations, *see* Letter from M. Stagg to D. Shaffer dated Feb. 15, 2005 (attached as Exhibit 13) at 4; and then indicated in March that, whatever the terms or outcome of subsequent negotiations, TES could not accept any of the remaining elephants until this September at the earliest (when a new facility is scheduled to be completed), Letter from M. Stagg to D. Shaffer dated Mar. 3, 2004 (Exhibit 14), which USDA and Defendants-Intervenors agreed would pose months of unacceptable delay. Also in March, Defendants-Intervenors proposed and USDA approved donations of three members of the Hawthorn herd that are not at issue here (Billy, Sue, and Frieda) to Pat Derby's PAWS in California; but the parties together were surprised in April, when PAWS indicated (on the eve of signing a donative agreement) that it no longer wishes to receive the elephants, as Ms. Derby confirms in her affidavit here. *See* Pls. Mem. Ex. 3 at ¶10; Letter from M. Bickelman to D. Shaffer dated Apr. 15, 2005 (attached as Exhibit 15).

Around the same time that the parties were intending to finalize donations of three elephants to PAWS, they also reached agreement in April that three other elephants, Ronnie, Joy, and Gypsy, would be donated to EAF. They did so following several weeks

---

[7] A fourth elephant, Tess, passed away in November 2004.

of communications between EAF, Defendants-Intervenors, and USDA, in which EAF

demonstrated its willingness and ability to provide proper care in accordance with

USDA's approval criteria, which include a prophylactic treatment plan and quarantine for

the elephants in order to ensure against any possible tuberculosis concerns.[8]  Specifically,

agreements were executed on May 18 for the three elephants to be donated from the

Hawthorn Corporation to EAF.[9]  *See* Donative Agreement dated May 18, 2005 (attached

as Exhibit 1).  Shortly thereafter, Defendants-Intervenors proposed and obtained USDA's

approval to also donate Debbie to EAF, and a separate donative agreement was executed

for her on June 1.  *See* Donative Agreement dated June 1, 2005 (attached as Exhibit 2).

Defendants-Intervenors then arranged for all four elephants to be promptly and safely

transported to EAF on June 7, in accordance with a specific transportation plan approved

by USDA.  *See* Letter from B. Juarez to D. Shaffer dated June 3, 2005 (attached as

Exhibit 16).  This transportation plan was initially delayed because Oklahoma's State

Veterinarian raised concerns about possible tuberculosis, following a concerted campaign

in which Plaintiffs had urged their supporters around the country to send letters to the

---

[8] Though these elephants were, years ago, exposed to Misty and Lota (the two former members of the Hawthorn herd that USDA deemed tubercular), none has ever tested positive for tuberculosis and all have completed eighteen-months of negative testing following their exposure; as a result, they would ordinarily be cleared for travel and exhibition under USDA's established *Guidelines for the Control of Tuberculosis in Elephants*, developed by The National Tuberculosis Working Group for Zoo & Wildlife Species.  *See* Declaration of Dr. J. Oosterhuis (attached as Exhibit 5) at ¶¶7-14.  Even so, USDA has deemed it prudent to require prophylactic measures from donee facilities such as EAF.

[9] Plaintiffs knew no later than May 18 that these donations had been executed with USDA's approval, as they reported as much on their website.  *See* Declaration of M. Haebler (attached as Exhibit 6) at ¶¶2-6.

State Veterinarian conveying precisely those concerns, per a template posted on PETA's web site.  *See* Declaration of M. Haebler (attached as Exhibit 6) at ¶¶9-10.[10]

On the afternoon of June 8, one day after the elephants had been scheduled to arrive at EAF, Plaintiffs filed the instant suit, challenging USDA's approval decision and seeking a temporary restraining order.  That same day, while they were attempting to resolve the tuberculosis issue with Oklahoma authorities, Defendants-Intervenors assured the parties and the Court that they would not transport the elephants to EAF until Monday, June 20, at the earliest.  On June 9, Defendants-Intervenors further assured the parties and the Court that they would further agree not to transport the elephants until Wednesday, June 22, at the earliest, in keeping with the current schedule;[11] Defendants-Intervenors also that day filed an unopposed motion to intervene.  On June 10, the Court issued orders converting Plaintiffs' request for a temporary retraining order into one for a preliminary injunction, setting the operative schedule, and granting Defendants-Intervenors' requested intervention.

---

[10] Notably, no such campaign or purported concern about tuberculosis was pursued by Plaintiffs when Misty and Lota, the only members of the Hawthorn herd that USDA had *in fact deemed tubercular*, were slated for transportation to *TES* in 2004; or when Delhi, another "tuberculosis-exposed" member of the Hawthorn herd, was sent to TES in November 2003.  Quite the contrary, Plaintiffs actively supported and urged those placements with TES.  Plaintiffs did so although during that period (i) TES had not "completed the construction of a special barn that can house the tuberculosis-exposed elephants" (a development Plaintiffs trumpet while acknowledging that it is not scheduled to happen until September of this year), Pls. Mem. at 6; and (ii) in the case of Misty and Lota, Tennessee authorities, acting on their own medical judgment, expressed outstanding concerns about the tuberculosis risk.

[11] Discussions still remain underway with the relevant Oklahoma authorities to resolve outstanding health concerns.

### B.    Statement Of Facts.

Defendants-Intervenors are headquartered in Grayslake, Illinois.  Since 1950, they

have owned and leased exotic animals of international acclaim for use in public

exhibitions, including circuses.  Their animals are currently kept at a secure facility in

Richmond, Illinois that is closed to the public.  Although Defendants-Intervenors

continue to exhibit tigers, their elephants for the past three years have not been exhibited

and have remained in Richmond.  *See* Declaration of J. Cuneo (attached as Exhibit 3) at

¶¶1-3, 10-11; Verified Complaint Ex. G at ¶¶1-5.

Each of the four elephants presently remaining with Defendants-Intervenors and

slated for donation to EAF has been owned by Defendants-Intervenors for at least the

better part of a decade – and, in the case of Ronnie, for three decades, since she was very

little.  Since early in their lives, these elephants have all been trained for and accustomed

to circus life, a life that involves extensive human contact and travel and affords

stimulation that they manifestly enjoy.  Besides interacting well with one another, these

elephants relate especially well with humans who work with them.  For more than a year

now, Defendants-Intervenors' foremost desire with respect to the elephants at issue –

which they do not exhibit, sell, or otherwise stand to profit from – has been to find the

right home for them, with people they know will love them and provide excellent care.

This desire has, alas, proved to be a costly one, involving extensive litigation, delays, and

other difficulties, which Defendants-Intervenors continue to bear only because of their

profound attachment to these elephants and concern for their lifelong well being.

Because Defendants-Intervenors' are responsible for and committed to providing

housing, food, and other care to these elephants while they remain at their facility, as well

as arranging and financing transportation of the elephants to EAF, additional delay and disruption of the proposed transportation plan necessarily entails significant costs, potentially on the order of thousands of dollars. *See* Declaration of J. Cuneo (Exhibit 3) at ¶¶6-9, 24, 35-37.

EAF is an outstanding facility that is held in the highest regard throughout the circus and elephant community. It is a non-profit corporation that harbors elephants – only some of which are used for breeding and/or for use in the Carson & Barnes Circus – and has done so successfully since the 1950s without ever being found to have violated the AWA or regulations thereunder. Barbara Byrd, who runs EAF along with the Carson & Barnes Circus, is preeminent within the elephant community as a caregiver and custodian who takes excellent care of, and truly loves, her animals. Mr. Cuneo has known her and her staff for decades and holds them in the highest esteem. These elephants are particularly well suited for EAF because they are females of breeding age. Consistent with USDA's approval criteria, EAF has committed to housing the elephants at issue in a separate facility where they will be quarantined and kept from public contact – this means that they will not travel with or otherwise join the Carson & Barnes Circus. *See* Declaration of B. Byrd (Exhibit 4); Declaration of J. Cuneo (Exhibit 3) at ¶¶7, 30-38.

Plaintiffs are ideologically opposed to EAF. According to the theory of "animal rights" to which Plaintiffs subscribe, there is no such thing as proper or acceptable use of an elephant in a circus (or, indeed, in any public interaction), and EAF is, by virtue of its relationship with Carson & Barnes, somehow complicit in what they decry. *See* Declaration of J. Cuneo (Exhibit 3) at ¶¶26-29; *see also* Declaration of B. Byrd (Exhibit 4) at ¶¶17-27. (Indeed, we defy Plaintiffs to identify a *single* circus currently exhibiting

elephants that they would not oppose as a donee – that they would not paint as "a notorious abuser of elephants and a repeat violator of the Animal Welfare Act." Pls. Mem. at 1.) Similarly, Plaintiffs oppose EAF because it, of all things, employs "breeding procedures," Pls. Mem. at 13, contrary to the precepts of those like Pat Derby, according to which elephants must "not [be] allowed to breed" at the facilities within her tiny fold. Pls. Mem. Ex. 3 at ¶4; *see* Declaration of M. Haebler (Exhibit 6) at ¶¶7-8. To be clear about this, according to the dictates followed by Plaintiffs' three anointed facilities, it is taboo to let these animals *procreate*. These views are sufficiently radical that Plaintiffs are left pointing insistently to "one such facility" that is, at least within their circles, "world renowned," and should receive all the members of the remaining Hawthorn herd (except the male, Nickolaus, who would no doubt pose an unacceptable risk of procreating). Pls. Mem. at 5. Because PAWS has expressly declined further donations, TES is the only remaining haven for "animal rights" that Plaintiffs might sanction to receive these elephants, and they therefore insist that any and all elephants that can fit within must go there. As it turns out, TES is full right now and will not open its doors to new comers. *See* Letter from M. Stagg to D. Shaffer dated Mar. 3, 2005 (Exhibit 14). Yet that is inconsequential to Plaintiffs because TES is building an extension that should be ready "by September 2005," Pls. Mem. at 6 – and Plaintiffs evidently are glad to have any further placements wait until then. Suffice it to say that USDA is not obliged to adopt this particular brand of ideology as though it were governing law.

But, make no mistake, Plaintiffs' proselytizing comes with formidable fire and brimstone. Here, virtually all of it is unfortunately and unfairly directed at EAF. To convert their ideology into legal briefs, Plaintiffs must claim facts purportedly showing

that EAF and Carson & Barnes are not simply operating outside of their select fold, but doing so contrary to the AWA and regulations. Plaintiffs do so with great gusto but feeble facts. Behind the vitriol they hurl lies only a handful of instances in which Carson & Barnes – not EAF – was even cited by USDA for possible violations, none of which ultimately gave rise to a finding of violation. Notably, these instances relate to minor transportation issues as opposed to general treatment of elephants at stationary facilities like EAF, the relevant donee. *See* Verified Complaint at ¶25. That Carson & Barnes has such an all-but-spotless record, reflecting not a *single* violation of the AWA or regulations that it has ever been found to commit, after *decades* traveling and performing its elephants all around the country, under constant USDA supervision and ceaseless criticism from PETA, is to its credit and certainly could not disqualify it as a donee. *See* Declaration of B. Byrd (Exhibit 4) at ¶¶1-5, 15-35. The conclusive proof of Carson & Barnes' existing compliance is that it continues to own and exhibit elephants under a valid exhibitor's license issued and administered by USDA under the AWA and regulations.

Plaintiffs nonetheless resort to overwrought allegations of animal abuse that find nothing more to support them than Ms. Leahy's conclusory statements in her affidavit, which Ms. Byrd persuasively answers at length. *See* Declaration of B. Byrd (Exhibit 4) at ¶¶15-35. Worst of all, Plaintiffs try to introduce fabricated footage purporting to depict Tim Frisco of Carson & Barnes abusing elephants. *See* Verified Complaint Ex. A. That the relevant DVD has been doctored is *plain on its face*: among other things, it contains a soundtrack that was obviously dubbed separately, after the video was filmed; it contains undifferentiated footage admittedly edited and spliced together from unspecified

originals taken over a six-month period, Pls. Mem. Ex. 1 at ¶3; and it intersperses commentary from PETA itself thrown in for added effect. Where are the original tapes from which this video was created? Where is an affidavit from the actual "employee in [Mary Beth Sweetland's] department" who might attest to its *bona fides*? Pls. Mem. Ex. 1 at ¶3. Tellingly, Plaintiffs do not answer these and other glaring questions. Their video is a propaganda piece that reveals everything about their chosen means of advancing their agenda and nothing about how Carson & Barnes actually treats its elephants. In no event does this videotape merit consideration by a federal court, even setting aside its grave evidentiary defects under Rules 901 and 1002 and the principles that underlie them.[12]

## ARGUMENT

The standard governing Plaintiffs' request for a preliminary injunction is well known to this Court. In essence, the Court must weigh four basic factors: (1) Plaintiffs' likelihood of success on the merits; (2) irreparable harm faced by Plaintiffs; (3) harm to other parties; and (4) the public interest. *See, e.g.*, *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1997). Though Plaintiffs reformulate the first factor in terms of whether "there is a 'substantial question' on the merits that is 'fair ground for litigation,' " Pls. Mem. at 6 (quoting *Washington Metropolitan*, 559 F.2d at 843-44), their formulation holds only for "a case in which the other three factors strongly favor interim relief." *Washington Metropolitan*, 559 F.2d at 843. And if other factors "either are a wash or are inextricably linked to the merits," then a determination that

---

[12] This is why Defendants-Intervenors respectfully oppose admission of this DVD, Plaintiffs' Verified Complaint Exhibit A, into evidence, as Plaintiffs correctly note in their relevant motion and memorandum in support thereof, filed June 13, 2005.

Plaintiffs are "not likely to succeed on the merits effectively decides the preliminary injunction issue." *Serono Laboratories*, 158 F.3d at 1326.

In any case, the niceties of the precise standard should not matter to the Court's decision here.  Plaintiffs clearly lack standing at the threshold to obtain any relief whatever.  Their arguments on the merits are altogether doomed.  The only irreparable harm Plaintiffs might plausibly articulate at this point concerns mere transportation of these elephants, which are all thoroughly accustomed to traveling from life in the circus; the prospect of one more trip cannot ground a request for injunctive relief.  In contrast, the harm to Defendants-Intervenors from delaying donations, in terms of financial cost and otherwise, is demonstrable and very real.  And it would be contrary to the public interest to let what has already been a challenging and protracted effort to donate elephants become further complicated and prolonged by "animal rights" disciples that want to second-guess, if not hijack, it.

### A.    Plaintiffs Lack Standing.

In order to obtain any judicial relief, Plaintiffs must show that they have standing.  Here, they cannot do so for at least three distinct reasons:  First, under Article III, they do not face any "injury in fact" from the ultimate disposition of these elephants.  Second, likewise under Article III, to the extent Plaintiffs might face any such injury, it cannot be "redressed" at this time, because private donations to EAF have already been lawfully effectuated, because Plaintiffs will not have personal access to these animals no matter where they go, and because there can be no confidence that Plaintiffs would obtain from this Court the only relief they claim would protect them against injury – namely, placement of the elephants specifically with TES.  Third, as a prudential matter, Plaintiffs

are outside the "zone of interests" of the consent decision underlying their claim.

### 1. Plaintiffs Have No "Injury in Fact" That Is "Redressable."

We begin with the Constitution. "Before addressing the merits of a claim, [a court] must determine whether [plaintiffs] have standing to bring th[eir] suit. . . . [A] plaintiff may secure constitutional standing if he can show injury in fact that is fairly traceable to the defendant's action and is redressable by the relief requested." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 628 (D.C. Cir. 1996) (internal quotation and citation omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs know that injury in fact is a problem for them, so they artfully craft a few conclusory statements in Ms. Leahy's verified complaint that, without saying much of substance, seem calculated to connote the D.C. Circuit's decisions in *Animal Legal Defense Fund v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) (en banc), and *American Society for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334 (D.C. Cir. 2003). Here is what Ms. Leahy says in the critical part of the Complaint:

> For many years, Ms. Leahy has followed the status of the Hawthorn elephants, and she has been in the forefront of advocating their protection, rescue, and placement with a sanctuary. In fact, Ms. Leahy has had many discussions with representatives of the USDA and Hawthorn's owner, John Cuneo, about these elephants. She has also had the pleasure of visiting the elephants and getting to know them personally. As a result, she has grown extremely fond of them, and has formed a strong, personal attachment to these particular animals. In fact, recently Mr. Cuneo invited Ms. Leahy to come to his facility to again visit these elephants. Ms. Leahy intends to visit the animals as often as she is able, although doing so, when the animals continue to be maintained by entities that mistreat them and fail to provide them with the veterinary and other care they so desperately need, causes her great aesthetic and emotional harm.

Verified Complaint at ¶3.

This bid for standing must fail.  Note how carefully all this is worded.  Ms. Leahy, while asserting that she has "had the pleasure of visiting the elephants and getting to know them personally," offers no meaningful specifics as to *which* elephant(s) she has visited, *when* she has done so, *where* she has done so, *how many* times she has done so or for *how long*, or even *what* her "visit" consisted of.  She in no way differentiates one elephant from another in explaining how she "know[s] them personally."  Then there is Ms. Leahy's allegation that "recently Mr. Cuneo invit*ed* [her] to come to his facility to *again* visit these elephants."  Here, Ms. Leahy tellingly uses the word "again" to modify "visit" – thereby conspicuously steering clear of saying she was invited to "*again* come to his facility," which would entail (we think erroneously) that she has ever in fact been "to his facility".  Moreover, she refers to Mr. Cuneo having "invited" her, past sense, signaling her acknowledgment that no such invitation exists, just as no actual visit ever resulted.  Finally, in saying that she will "visit the animals as often as she is able," Ms. Leahy does not specify whether she expects to be able to visit them ever again or what facilities she thinks would let her, let alone lay out concrete plans to do so.

The reason for all this is simple:  The facts are squarely against Ms. Leahy on all of these points.  She is attempting to claim standing with respect to four discrete elephants, each of which is *privately* owned, *none* of which has been publicly exhibited for the past three years, and *all* of which are now at and later destined for secure facilities that will not permit public access to them; indeed, one of USDA's approval criteria is that the elephants *cannot* have public contact, no matter the donee.  It is worth setting out the specific facts that bear upon Ms. Leahy's alleged standing:

- The Hawthorn facility in Richmond, Illinois, which is where Ronnie, Gypsy, Joy, and Debbie have all been kept for the past three years, is

locked, gated, and closed to the public.  Ms. Leahy has never been granted permission to enter the facility, nor do we know of any realistic means by which she could have trespassed.  *See* Declaration of J. Cuneo (Exhibit 3) at ¶¶3, 10-18.

- After diligent and comprehensive inquiry, we have identified one and only one instance in which Ms. Leahy *might* possibly have entered the facility. On or around November 22, 2003, USDA forcibly confiscated a Hawthorn elephant named Delhi and was accompanied on that occasion by unidentified individuals who appeared not to be from USDA.  Giving Ms. Leahy every benefit of the doubt, and assuming that she was among those individuals (which she has not alleged), she would have been inside the gates of the facility for a maximum of three hours (while efforts were underway to actually load Delhi) and relegated to the area from which Delhi was loaded, which is out of sight from the secure, indoor portion of the facility where all of the elephants at issue were being kept and none of the women who were observing entered.  *See* Declaration of J. Cuneo (Exhibit 3) at ¶¶15-18.

- The only instance in which Ms. Leahy might have understood herself to have been "invited" to visit the elephants was on or around May 9 of this year, when Mr. Cuneo indicated, in response to a telephone inquiry from Ms. Leahy, that he might be able to arrange for her to come to the facility on one occasion to see it and the elephants for herself, but said he would need to get back to her about that.  He indeed got back to her within two days and told her that she would not be granted the access under discussion.  Mr. Cuneo has not extended an invitation since, nor does he intend to do so.  *See* Declaration of J. Cuneo (Exhibit 3) at ¶¶21-23.

- Perhaps Ms. Leahy would allege that she "visited" the elephants at a circus.  Again, giving Ms. Leahy every benefit of the doubt and assuming that she might, years ago, have attended a circus at which Hawthorn elephants performed, it defies credulity that she would have identified any of the performing elephants as specifically among those now at issue.  But, even assuming she did, she would have observed them from a safe distance, behind a secure area, and would have had no more access, contact, or relationship with the elephant than did the general public in attendance.  *See* Declaration of J. Cuneo (Exhibit 3) at ¶20.  It seems impossible to consider this any sort of meaningful "visit."

- In terms of any future stake in visiting these elephants, they will no longer be exhibited to members of the public, *regardless* of how this case is resolved.  Thus, Ms. Leahy cannot visit them at Hawthorn, *see* Declaration of J. Cuneo (Exhibit 3) at ¶23, cannot visit them at EAF, *see* Declaration of B. Byrd (Exhibit 4) at ¶42, and presumably cannot even visit them at her hallowed TES, which forbids public contact as a matter of policy and

19

would have to do so for purposes of obtaining USDA's approval in any event.  *See* Declaration of M. Haebler (Exhibit 6) at ¶¶7-8.

Given these facts, Ms. Leahy does not stand to suffer any cognizable or redressable injury under the cases Plaintiffs cite.  In *Glickman*, the relevant Plaintiff, Marc Jurnovee, established a cognizable aesthetic interest because he "ha[d] regularly visited and plan[ned] to keep visiting . . . . a particular animal exhibition to observe particular animals there," at a zoo that was of course open to him as a member of the public.  154 F.3d at 431-32.  In terms of the particulars, Mr. Jurnovee attested that he had visited the relevant zoo "at least nine times" on specified dates, including one visit that "lasted approximately six hours"; and had observed particular animals and conditions, taking photographs and videotapes of them on various occasions.  *Id*. at 429-30.  In addition, he stated "his intent to 'return to the Farm in the next several weeks' and to 'continue visiting the Farm to see the animals there.' "  *Id*. at 430 (quoting affidavit).  Ms. Leahy is on vastly different footing.  Unlike Mr. Jurnovee, she is attempting to claim an interest in four specific elephants at issue that (i) are privately-owned and inaccessible to the public, (ii) she has not differentiated from one another or from other members of the herd so as to establish a relevant or concrete interest in any one,[13] (iii) she has not specified, let alone documented, a single meaningful visitation with, and (iv) she has not established any ability, let alone imminent plans, to visit.  If the requirement of a concrete, particularized, and redressable injury in fact means anything, then Ms. Leahy has not satisfied it.

---

[13] This alone is fatal to Ms. Leahy's standing, for there is no indication that the specific elephants with which she claims to have developed a special relationship are the ones allegedly at risk of mistreatment.  In *Glickman*, the D.C. Circuit attributed an analogous defect to a *Lujan* plaintiff who failed to establish the requisite interest in a specific, "smaller area of land that was allegedly threatened."  154 F.3d at 436.

*Ringling Bros.* is equally unavailing for Ms. Leahy and in fact cuts squarely against her.  There, the relevant plaintiff, Thomas Rider, alleged that he had worked directly with the elephants for more than two years, during which time "he formed a 'strong, personal attachment to these animals.' "  317 F.3d at 335.  As a result, Mr. Rider showed that "he became attached to the elephants when he worked with them and would like to visit them again," which he could do simply by "attending the circus as any member of the public would, by purchasing a ticket and viewing the show from the audience."  *Id*. at 337.  But it was critical that Mr. Rider had a preexisting relationship with the elephants beyond simply having observed them while they were performing:

> [In attending the circus,] he might observe either direct physical manifestations of the alleged mistreatment of the elephants, . . . or detect negative effects on the animals' behavior, *which he claims he would recognize based on his experience working at Ringling Bros*.  This takes his claim *out of the category of a generalized interest in ensuring the enforcement of the law,* which would be *insufficient to establish Article III standing.  And it distinguishes him from other members of the public, including those who attend the circus.*

*Id*. at 337 (emphases added) (internal citations omitted).  Thus, Ms. Leahy differs from Mr. Rider in at least two respects that foreclose her from claiming standing:  she has not established a "strong, personal attachment to these animals" that would differentiate her from "other members of the public, including those who attend the circuses," when it comes to perceiving any indicia of their alleged mistreatment or otherwise; neither has she established how she might henceforward specially "observe" or "detect" their circumstances firsthand, so as to "take[ her] claim out of the category of a generalized interest in ensuring the enforcement of the law."

PETA's claim to standing is even weaker.  Plaintiffs' Complaint suggests a theory whereby PETA suffers injury in that it would "have to continue spending resources,"

lobbying USDA, and "continuing to keep its members informed about the welfare of these animals"[14] should they go to one of its many disfavored facilities. Verified Complaint at ¶7. Of course, this is nothing more than a reformulation of PETA's "generalized interest in ensuring the enforcement of the law," 317 F.3d at 377 – which is precisely what *Ringling Bros.* instructs cannot give rise to standing. In addition, this purported injury is "wholly within [PETA's] control" and will not arise "unless [it] makes a further choice to subject [it]self to it"; therefore, the injury at issue cannot be called " 'certainly impending' " such that it might satisfy Article III. *Animal Legal Def. Fund v. Espy*, 23 F.3d 496, 500-01 (D.C. Cir. 1994) (citation omitted). Further still, assuming PETA could show any cognizable injury, it would not be redressable by this Court: As Plaintiffs correctly note, the most they can achieve here is "to require the agency to continue to negotiate with Mr. Cuneo for the placement of the animals at a suitable facility." Pls. Mem. at 14. That by no stretch would ensure placement at TES, the one facility PETA deems trustworthy enough to redress its claimed injury. Finally, the black-letter law of associational standing requires, among other things, a showing that "at least one of their members has standing." *See, e.g.*, *American Library Ass'n v. FCC*, No. 04-1037, 406 F.3d 689, 2005 U.S. App. LEXIS 7847, at *19 (D.C. Cir. May 6, 2005). The only member for which PETA has attempted to show standing is Ms. Leahy – if, indeed, she is a "member" as opposed to simply an employee. *See* Verified Complaint at ¶3. And, to the extent that her claim to standing fails for reasons stated above, PETA's claim must fail with it.

---

[14] The reasoning behind this last claim is especially dubious, for any casual observer of PETA's website knows it is not shy about also "keep[ing] its members informed about the welfare" of various animals in order to proclaim its successes.

Last of all, Plaintiffs' challenge comes too late under any account of their standing. The donations to EAF of which they complain have already been effectuated by way of signed, donative agreements, previously approved by USDA. *See* Donative Agreements (Exhibits 1 & 2). Though Plaintiffs have sued USDA on the eve of actual transportation, the underlying donations of Ronnie, Joy, Gypsy, and Debbie from Hawthorn to EAF are already a *fait accompli* – a matter of private agreement wholly beyond reach of the APA. As such, Plaintiffs' claimed injury is not redressable by this Court. *See Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410, 1413 (D.C. Cir. 1998) (no redressability where a company had already been transferred from one to another with FCC approval, such that court "kn[e]w of no action we can take to return" it).

## 2.    Plaintiffs Are Outside the Relevant "Zone of Interests."

Quite apart from constitutional requirements, Plaintiffs also cannot satisfy the prudential zone-of-interest test, requiring "the prospective litigant [to] show either a congressional intent to protect or regulate the interest asserted, or some other indication that the litigant is a suitable party to pursue that interest in court." *Espy*, 23 F.3d at 502. Although the AWA suggests "a commitment to administrative supervision of animal welfare," *International Primate Prot. League v. Institute for Behavioral Research*, 799 F.2d 934, 939 (4th Cir. 1986), and indicates on its face that Plaintiffs, as opposed to USDA, "are not the intended representatives of the public interest in animal welfare, *Espy*, 23 F.3d at 503, the D.C. Circuit sitting *en banc* held in *Glickman*, for purposes of the zone of interests, that "the AWA anticipated the continued monitoring of concerned animal lovers to ensure that the purposes of the Act were honored." 154 F.3d at 445.

Even so, there is reason to be leery of distending the outer limits of this zone so as

to encroach upon USDA's statutory enforcement authority. Here, Plaintiffs' APA challenge is not grounded in the *AWA itself* as a statute or in *any regulation* promulgated thereunder. Rather, as Plaintiffs explain, their challenge is grounded upon the specific provision of the *consent decision* between USDA and Defendants-Intervenors whereby "the agency has imposed upon itself the duty to 'approve' placement of the animals." Pls. Mem. at 3. Absent the consent decision, Defendants-Intervenors would not even need approval from USDA to donate their elephants however they please. This underlying consent decision that gives rise to USDA's approval decision, and, thereby, to Plaintiffs' challenge, is purely a product of negotiations between USDA and Defendants-Intervenors arising from USDA's exercise of its enforcement authority. We know of no authority for the proposition that Plaintiffs could possibly be within the "zone of interests" of such an agreement. Certainly the parties themselves never contemplated or intended that Plaintiffs might be. If this Court were nonetheless to entertain arguments from Plaintiffs, as third parties, about the terms of the parties' consent decision, it should proceed with the utmost caution.

### B. Plaintiffs Cannot Succeed On The Merits.

Various doctrines foreclose Plaintiffs' effort to challenge USDA's exercise of its enforcement authority, under the terms of a consent decision presided over by another tribunal. Assuming, however, that the Court were to treat this as a run-of-the-mill APA challenge in which Plaintiffs argue that USDA reversed its approval decision regarding EAF without adequate justification, the justifications are obvious, they are numerous, and they are ample.

1.    **The Approval Decision Is Committed to Agency Discretion**.

The law is clear that "USDA's decisions about whether to undertake enforcement actions are generally unsuitable for judicial review, *see, e.g., Heckler v. Chaney*, 470 U.S. 821, 831 . . . (1985)." *Glickman*, 154 F.3d at 431 n.3. Here, Plaintiffs do not remotely suggest that there are extraordinary circumstances warranting judicial inquiry into USDA's exercise of its enforcement authority. Thus, had USDA in the first instance decided not to bring an enforcement action against Defendants-Intervenors, Plaintiffs would have nothing to say about it. The same should hold had USDA sought lesser or different penalties, or negotiated different terms, or declined to enforce certain terms, or agreed with Defendants-Intervenors to modify the consent decision, with the approval of Chief Judge Hillson.

Plaintiffs appear to contend that, notwithstanding all this, by negotiating terms as it did, USDA "imposed upon itself the duty to 'approve' placement of the animals with a facility that the agency has determined has 'demonstrated the ability to provide care' for the Hawthorn elephants in 'accordance with the [AWA] and the Regulations.' " Pls. Mem. at 3 (quoting Order at ¶3). Of course, it is no less true that USDA has "the duty" to enforce the AWA and regulations. And the question whether USDA's execution of that duty is agency action that is generally reviewable under the APA is quite distinct. The answer to *that* question under *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), is no; and we respectfully submit that the same answer should hold here. USDA's exercise of its approval discretion, under the terms of a consent decision it has arrived at pursuant to its enforcement authority, is akin to any other exercise of its prosecutorial discretion for purposes of an APA challenge. We perceive no reason – and Plaintiffs certainly have not

offered any – as to why this Court should treat USDA's exercise of its approval authority under the consent decision any differently than it would any other aspect of USDA's enforcement decisions, in this case or otherwise.

This equation is especially compelling with respect to provision of the consent decision specifically at issue, which requires a determination that a donee facility is able to comply "with the Act and the Regulations."  That determination by USDA is simply the converse of a determination that a particular facility is *not* complying with the AWA and regulations so as to potentially warrant an enforcement action.  It follows that USDA's decision to approve EAF at the present time, though not before, should be no more susceptible to judicial review under the APA than would a decision to bring an enforcement action against one facility but not another; or to bring an enforcement action at one point in time but not another; or to bring an enforcement action under one set of facts but not another.  Here, Plaintiffs are challenging USDA's approval of EAF in exercise of its enforcement discretion, pure and simple.  The upshot is that Plaintiffs' theory is effectively foreclosed by *Heckler v. Chaney* and its progeny.  Indeed, in our view, USDA's approval of EAF does not even constitute "agency action within the meaning of a relevant statute," so as to entitle Plaintiffs to *any* judicial review under the APA.  5 U.S.C. § 706(2).

There is still further reason to be leery of Plaintiffs' APA theory:  the consent decision at issue has been entered by another court as its own order, and remains under that court's ongoing supervision.  *See, e.g.*, Orders memorializing status conferences (Exhibit 10).  If Chief Judge Hillson believed that USDA were acting contrary to the terms of his order, then he would be in a position to say so (though he would presumably

be amenable to any modification to which the parties might agree), which he has not done

to date. Admittedly, Chief Judge Hillson has not sought to be apprised of all the

particulars of USDA's individual approval decisions or the considerations that inform

them. Nevertheless, Plainitiffs' are arguing here about what Chief Judge Hillson's order

requires, and asking this Court to decide that. This is, at best, an awkward circumstance,

and one that is readily avoided simply by deferring to Chief Judge Hillson as the proper

authority regarding the terms of his consent order. *Cf. Treadaway v. Academy of Motion*

*Picture Arts & Scis.*, 783 F.2d 1418, 1422 (9th Cir. 1986) ("When a court entertains an

independent action for relief from the final order of another court, it *interferes with and*

*usurps the power of the rendering court* just as much as it would *if it were reviewing that*

*court's equitable decree.*") (emphases added).

   Finally, the practical mischief worked by Plaintiffs' APA theory should not be

overlooked. If USDA's execution of its obligations under its consent decisions truly is

subject to APA challenge, then why not its negotiation of its consent decisions as well?

Even assuming that Plaintiffs' theory could be confined to the ultimate terms of a consent

decision and only those, strong disincentives would exist for USDA and respondents in

its enforcement actions to ever again arrive at consent decisions imposing prospective

obligations on USDA – for any such obligations would open the door to peripheral

litigation such as this in which third-parties, by invoking the APA, hail the parties into

federal district court so as to obtain a seat at the table. Here, this has meant that

Defendants-Intervenors, after working hard for many months to reach agreement with

USDA, have had donations disrupted at the last minute and been plunged into yet another

round of costly litigation. The perverse implications Plaintiffs' theory has for

administrative consent decisions in this regard are obvious and profound.  *Cf. In re Far West Meats*, 55 Agric. Dec. 1033, 1039 (J.O. 1996) (expressing concern about adopting rule permitting modification of a consent decision contrary to parties' agreement, because "many parties engaged in litigation might [then] be reluctant to resolve the litigation by the entry of a Consent Decision").

For these reasons, the Court need not even reach the administrative record in order to dispose of the merits of Plaintiffs' Complaint, which fails at the threshold to state a claim upon which relief can be granted.

### 2.    USDA's Approval Decision Is Amply Justified.

Assuming this Court were to reach Plaintiffs' factual submissions, USDA's approval decision is beyond reproach.  Beyond the high level of deference applicable to USDA's interpretations of the AWA as the statute it administers, *see Chevron v. NRDC*, 467 U.S. 837, 843 & n.11 (1984), and the even higher level of deference applicable to its interpretation of its own regulations, *see Auer v. Robbins*, 519 U.S. 452, 461 (1997), the level of deference here should be higher still.  The relevant provision of the consent decision, while referencing the AWA and regulations, reflects USDA's negotiation of a particular term in exercise of its enforcement authority.  Assuming, *arguendo*, that the fruit of such exercise is at all reviewable under the APA, judicial deference should be at its absolute zenith, for reasons stated above.

EAF's qualifications as a donee are obvious and irreproachable.  It is a respected, indeed, preeminent, habitat that has operated under USDA supervision for many years without serious incident and has won widespread acclaim throughout the mainstream elephant community.  *See* Declaration of J. Cuneo (Exhibit 3) at ¶¶7, 26-38; Declaration

of B. Byrd (Exhibit 4) at ¶¶1-13, 40, 44.  Much as Plaintiffs try to impugn EAF by attacking the Carson & Barnes Circus, the reality is that those attacks are moot:  the four elephants at issue are destined for their own structure at EAF where they will be housed separately from the other elephants and will not travel with or otherwise participate in Carson & Barnes.  *See* Declaration of B. Byrd (Exhibit 4) at ¶¶41-43.  But assuming Plaintiffs' attacks on Carson & Barnes had *full* application, they are unfounded to the point of scurrilous, for reasons detailed in the accompanying affidavits.  *See* Declaration of J. Cuneo (Exhibit 3) at ¶¶26-38; Declaration of B. Byrd (Exhibit 4).  By no stretch can these attacks dictate USDA policy.  At bottom, Plaintiffs are opposed to any and all use of elephants in circuses (which necessarily entails public contact and typically entails breeding), even though USDA's governing statute and regulations expressly contemplate and permit it.  *See, e.g.*, 7 U.S.C. § 2132(h) (defining a regulated "exhibitor" as "any person . . . exhibiting any animals . . . to the public for compensation," including "carnivals, circuses, and zoos"); 9 C.F.R. § 1.1.  By our view of the consent decision, the fact that Carson & Barnes currently holds a valid exhibitor's license reflecting its compliance with the AWA and regulations itself suffices to demonstrate that it is a qualified donee entitled to USDA approval; this alone should dispose of Plaintiffs' challenge.

Plaintiffs ultimately have only one colorable argument they can even articulate under the APA, which is that USDA's decision to approve EAF as a donee this past April amounts to an unexplained "reversal of course" from a prior decision not to do so in April 2004.  Pls. Mem. at 8.  Though Plaintiffs' characterize USDA as having declined to approve EAF on three separate occasions – April 30, May 21, and July 19, 2004, *see* Pls.

Mem. at 3 – that characterization is untenable.  Defendants-Intervenors initially proposed

EAF as a donee by way of a voicemail left for Complainant's counsel on March 23, 2004.

*See* Letter from B. Juarez to B. Boley dated Mar. 24, 2004 (Exhibit 11).  USDA

ultimately responded that it "does not approve . . . Endangered Ark Foundation (Carson

& Barnes Circus)" by letter dated April 30, 2004.  Although Defendants-Intervenors, in a

May 7, 2004 letter, asked USDA to "reconsider its disapproval of the four prospective

donees that Hawthorn proposed," including EAF (Letter from B. Boley to B. Juarez dated

May 7, 2004 (attached as Exhibit 12)), USDA did not purport to do so; instead, USDA by

letter dated May 21, 2004 (Verified Complaint Ex. D) said that EAF and certain other

proposed donees "*were* unable to demonstrate the ability to provide proper care for the

elephants in accordance with the Act and the Regulations," apparently explaining the

ground for its prior decision in April.  Thereafter, it was not until 2005 that EAF was

again proposed as a donee.  To be sure, during an exchange of letters between counsel in

which Defendants-Intervenors raised and USDA responded to concerns about the

approval process, USDA stated on July 19, 2004, that EAF "*has* not demonstrated the

ability to comply with the Act and Regulations," Letter from B. Juarez to D. Shaffer

dated July 19, 2004 (Verified Complaint Ex. E) (emphasis added) – but it did not purport

to do so in response to any intervening proposal of EAF as a donee, and that casual use of

the word "has" is not reasonably construed as reflecting a separate approval decision.

Thus, we submit that the only question that might properly be posed to this Court is this:

Did USDA have adequate justification for approving EAF in April 2005 notwithstanding

that it had declined to approve it in April 2004?[15]

---

[15] To be clear, it is Defendants-Intervenors' position, as indicated in our July 2004

The answer to that is an emphatic yes. Indeed, the same answer would hold no matter whether USDA had previously declined to approve EAF in April or July 2004, or both. Numerous developments in recent months have provided powerful justifications for USDA to reach a different approval decision in April 2005 than it did previously. The cases are legion permitting agencies to change their positions, provided only that they provide a "reasoned explanation" for having done so. *Amax Land Co. v. Quarterman*, 181 F.3d 1356, 1365 (D.C. Cir. 1999); *see, e.g., Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42-43, 57 (1983). That is so where an agency's position is arrived at by way of a rulemaking, whereas USDA here is simply exercising its approval authority under a consent decision with Defendants-Intervenors and only them – it accordingly stands to reason that USDA's approval decisions will, if anything, be less formal and more subject to change.

In any event, USDA has every good reason for changing course as it did:

- First, the "Animal Welfare Act compliance investigation" of Carson & Barnes that USDA specifically referenced in its July 19, 2004 letter as relevant to its prior decision not to approve EAF *concluded to USDA's satisfaction*.

- Second, Defendants-Intervenors in March 2005 *specifically proposed Ronnie, Joy, and Gypsy* (and later Debbie) *for donations to EAF*, which they had not previously done and comported with USDA's express conception that donations should be proposed in reference to specific elephants and specific donees for which they are appropriate.

---

submission to Chief Judge Hillson (which remains pending), that EAF was due for approval in April 2004. We do not mean to say or suggest anything inconsistent with that in framing the relevant question as we do. It is simply our position that, whatever the validity of USDA's initial approval decision, intervening circumstances have provided adequate justification for USDA to change course.

- Third, EAF arranged and in March 2005 specifically proposed to USDA for *a separate structure to house these elephants* – thereby enhancing its qualifications as a donee able to provide proper care, and assuring USDA that prophylactic measures would be in place to address any outstanding concerns about tuberculosis exposure.

- Fourth, the elephants in November 2004 *successfully completed their eighteen months of negative tuberculosis tests*, following their prior tuberculosis exposure, in accordance with *Guidelines for the Control of Tuberculosis in Elephants*, as developed by The National Tuberculosis Working Group for Zoo & Wildlife Species – thereby further ameliorating any possible concern about tuberculosis. *See* Declaration of J. Oosterhuis (Exhibit 5) at ¶13.

- Fifth, *other potential donees*, including TES and PAWS in March 2005 *proved unable or unwilling to receive the elephants*, requiring the parties, under the terms of the consent decision, to agree upon other suitable donees "as swiftly as possible."

- Sixth, Chief Judge Hillson, in August 2004, *granted a stay* of the consent decree's donative deadline in response to Defendants-Intervenors' contentions that USDA was unreasonably withholding its approval, *and urged the parties to work more flexibly and cooperatively toward agreed-upon placements*.

Any one of these would have provided adequate justification for USDA to have changed course and approved EAF in April 2005. All of them together eliminate any doubt that Plaintiffs' APA claim, even if reached, is doomed on the merits and due to be dismissed.

## C. Plaintiffs Lack Irreparable Harm.

It is difficult to comprehend Plaintiffs' account of irreparable harm. Bear in mind that Plaintiffs do not seek for the elephants at issue to be immediately routed to TES, nor could they. *See* Pls. Mem. at 14. Indeed, even if this Court were in a position to order such relief (which it clearly is not), TES is unwilling and unable to receive the elephants until September. *See* Letter from M. Stagg to D. Shaffer dated Mar. 3, 2005 (Exhibit 14). Thus, the only thing potentially at stake right now is whether the elephants will presently remain with Defendants-Intervenors in Richmond, Illinois, or be transported to EAF in

Hugo, Oklahoma.  (As for donation, as opposed to transportation, of the elephants, it has already been effectuated and the relevant agreements have been signed.  *See* Donative Agreements (Exhibits 1 & 2).)  Yet Plaintiffs are so indiscriminate in attacking Defendants-Intervenors and Carson & Barnes alike for their alleged "mistreatment" of elephants, *see, e.g.*, Verified Complaint at ¶¶6, 18, 25, that even accepting, *arguendo*, everything they say as true, they have no colorable case of irreparable harm.  According to Plaintiffs, whether these elephants go to EAF or stay at Hawthorn, the same "harm" of alleged "mistreatment" exists.  To impact the injunction calculus, the harm in question must of course be curable by the requested injunction.  But here the main harm Plaintiffs purport to identify is wholly beside the point.[16]

Plaintiffs' claim of irreparable harm is therefore left dangling by only the frailest of threads.  They claim there will be "trauma caused to the animals in transport" to EAF.  Pls. Mem. at 12 n.2.[17]  That will not do.  These elephants are inveterate travelers, having

---

[16] Setting aside this analytical defect, the cases Plaintiffs cite do not help them make out a convincing case of irreparable harm.  The impending harm to animals in each of *those* cases involved government's plans to *systematically kill* the animals.  *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) ("Plaintiffs are claiming that they will suffer irreparable harm from the killing of . . . 525 mute swans."); *Fund for Aminals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (focusing upon "treatment of the bison . . . in an organized hunt"); *Fund for Animals v. Espy*, 814 F. Supp. 142, 147, 151 (D.D.C. 1993) (finding irreparable harm based upon "treatment in the manner contemplated of the wild bison," which was described thus:  " 'they will be rounded up and placed on trucks, they will be infected with B. abortus, they will be forced to abort calves in the late stages of pregnancy, and they will subsequently be killed.' ").  As terrible and distorted as Plaintiffs account of EAF may be, they do not remotely make out a case that the four elephants are destined for destruction there, let alone that this would be imminent upon their arrival.

[17] Although Plaintiffs here return to their complaints about Carson & Barnes' transportation history, which have been answered, *see* Declaration of B. Byrd (Exhibit 4), they overlook that *Defendants-Intervenors* are responsible for transporting the elephants

grown up with circuses and toured around the country with them for many years. *See* Declaration of J. Cuneo (Exhibit 3) at ¶36. All that hangs in the balance is one more trip, some 900 miles from Richmond, Illinois to Hugo, Oklahoma. What is the harm in that? Indeed, Part 3 of Title 9 of USDA's regulations expressly contemplates and permits the transportation of these elephant under specified standards. There simply is *no* cognizable harm associated with letting four elephants travel in accordance with law, let alone sufficient harm to justify preliminary injunctive relief.

### D. Defendants-Intervenors Suffer Harm Each Day Placements Are Delayed.

On the other side of the scale, Defendants-Intervenors incur costs and other burdens every day that donations are delayed. These include paying for the food, housing, and care that the elephants obviously need and deserve, and continuing to arrange and rearrange logistics for transporting the elephants to EAF. It is therefore odd for Plaintiffs to say that there is no harm done here because "Hawthorn is not receiving money for the elephants," Pls. Mem. at 15 – Hawthorn is *paying* money for the elephants each day that they remain with it rather than going to EAF. The relevant financial bill is on the order of thousands of dollars per month. *See* Declaration of J. Cuneo (Exhibit 3) at ¶24, *see also id.* at ¶9. This readily outweighs anything Plaintiffs have identified by way of potential harm to them.

Moreover, after publicly reporting on May 18 that USDA had approved donation of Ronnie, Joy, and Gypsie to EAF, *see* Declaration of M. Haebler (Exhibit 6) at ¶¶2-6, Plaintiffs inexplicably waited some three weeks, until June 8, to file this suit. By so

---

under the terms of the donative agreements and are presently planning to do so. *See* Donative Agreements (Exhibits 1 & 2).

doing, Plaintiffs have denied the parties the opportunity to address, and this Court the opportunity to consider, Plaintiffs' claims without prejudice to the scheduled donations and attendant imposition of costs upon Defendants-Intervenors. "The venerable maxim *vigilantibus non dormientibus aequitus subvenit* (equity aids the vigilant, not those who slumber on their rights) requires that a suit in equity, though otherwise meritorious, be dismissed if two requirements are met: (1) unreasonable delay in bringing the claim for relief and (2) prejudice caused by that delay." *Independent Bankers Ass'n v. Heimann*, 627 F.2d 486, 488 (D.C. Cir. 1980) (citations omitted). As such, unless and until Plaintiffs adequately explain their delay in filing suit, their request for preliminary injunctive relief should be altogether foreclosed.

> **E.** **The Public Interest Weighs In Favor Of Letting Placements Proceed.**

USDA and Defendants-Intervenors have been laboring since March 2004 to find fitting placements for the Hawthorn herd of elephants. Twelve of those elephants still await placement. After a rocky beginning, the parties have at last found common ground and agreed upon a donee facility, EAF, that is eagerly awaiting receipt of four elephants and has set aside a separate facility for precisely that purpose. The relevant papers have been signed, approval has been secured, and the transportation is ready to go, pending go-ahead from Oklahoma authorities and this Court. The public interest would not be served by letting this process become further complicated and prolonged by "animal rights" disciples that now want to second-guess, if not hijack, it.

**CONCLUSION**

For the foregoing reasons, Defendants-Intervenors respectfully request that

Plaintiffs' request for a preliminary injunction be denied, and that their claims be

dismissed for lack of standing, or, alternatively, on the merits.

Dated: June 15, 2005                          Respectfully submitted,


                                              ___s/Derek L. Shaffer_____
                                              Derek L. Shaffer
                                                    (DC Bar No. 478775)
                                              Vincent J. Colatriano
                                                    (DC Bar. No. 429562)
                                              Michael Weitzner
                                                    (DC Bar No. 472505)
                                              COOPER & KIRK, PLLC
                                              1500 K St., N.W., Suite 200
                                              Washington, D.C.  20005
                                              (202) 220-9600