DECLARATION OF ELIZABETH GOLDENTYER, D.V.M.

I, Elizabeth Goldentyer, hereby declare

1. I am the Eastern Regional Director of Animal Care, Animal and Plant Health Inspection Service ("APHIS"), United States Department of Agriculture. I have held this position for eight years. One of my duties is to manage the enforcement of the Animal Welfare Act ("AWA" or "Act"), as to animal exhibitors. I make this declaration in support of defendants' opposition to plaintiffs' motion for a preliminary injunction, in <u>Debra Lynne Leahy v. United States Department of Agriculture</u>, Civil No. 05-1135 (D.D.C.). I know the facts stated in this declaration of my own personal firsthand knowledge.

2. There is currently pending before the USDA an administrative enforcement proceeding under the AWA, entitled <u>In re John F. Cuneo, Jr., The Hawthorn Corporation, Thomas M. Thompson, James G. Zajicek, John N. Caudill, III, John N. Cuadill, Jr., Walker Brothers Circus, Inc., and David A. Creech</u>, AWA Docket No. 03-0023. On March 12, 2004, Chief Administrative Law Judge Marc R. Hillson issued a consent decision and order as to John F. Cuneo Jr. and The Hawthorn Corporation ("Hawthorn") in that case. Among other things, the consent decision and order requires that:

> "By August 15, 2004, respondents shall place all of their elephants, by donation, with persons who have demonstrated the ability to provide proper care for said animals in accordance with the Act and the Regulations, and whom the complainant has previously approved as donees."

3. To implement this provision of the consent decision, APHIS agreed to assist in identifying donee facilities, and invited Mr. Cuneo and Hawthorn to submit the

names of proposed donees for USDA approval. Before APHIS began its evaluation of potential donees it determined that it would not consider, as donees, AWA licensees that were the subject of an ongoing investigation for compliance with the AWA and the regulations and standards issued pursuant thereto.

    4.    There have been six cases of mycobacterium tuberculosis (human tuberculosis) diagnosed in the Hawthorn elephant herd in the last eight years. At the time the consent decision and order in AWA 03-0023 was issued, two Hawthorn elephants were culture-positive for human tuberculosis and fourteen Hawthorn elephants were exposed to human tuberculosis. Because of both the history of tuberculosis in the Hawthorn herd and the fact that there is no definitive method to identify a whether a live elephant may harbor latent tuberculosis, APHIS determined that allowing members of the Hawthorn herd to travel and be in contact with the public unnecessarily exposes the national elephant herd and the public to tubercular contagion, and compromises the health and well-being of the Hawthorn herd.

    5.    In March and April 2004, Mr. Cuneo and Hawthorn proposed the Carson & Barnes Circus's permanent facility – the Endangered Ark Foundation in Hugo, Oklahoma – as a donee ("Carson & Barnes" or "Endangered Ark Foundation"). At that time, Carson & Barnes was the subject of two ongoing APHIS investigations, and was therefore not approved as a donee:

    a.    Case # 04016 involved a five-year old, female Asian elephant that exhibited clinical signs associated with elephant endotheliothropic herpes virus while on travel in Texas. The elephant returned to Hugo, Oklahoma and died shortly thereafter. APHIS Investigative and Enforcement Services (IES)

conducted an investigation in connection with this incident and documented evidence that Carson & Barnes had provided the elephant with veterinary care in a manner consistent with and/or exceeding the requirements of the AWA. APHIS officially closed this case with no action on July 22, 2004.

  b. Case # 03033 involved a driver that was transporting two elephants that performed with the Carson & Barnes Circus. APHIS IES conducted an investigation and documented evidence that showed that the driver, who had exceed the allowed driving and duty hours under the relevant transportation regulations, fell asleep and veered off the road. The truck containing the two elephants tipped over causing the animals to sustained minor lacerations. Barbara Byrd, one of the Circus's owners, cooperated with APHIS's investigation. APHIS assessed, and Carson & Barnes paid, a $550 dollar penalty in connection with this incident. APHIS officially closed this case on August 16, 2004.

6. Since APHIS entered into the consent decision and order in AWA 03-0023, it has been the agency's position that the Hawthorn elephants be moved from Hawthorn's facility as soon as possible. In addition to the violations that lead to the consent decision and order, APHIS officials have continue to document evidence of further violations by Mr. Cuneo and Hawthorn in connection with their handling, husbandry, and care of elephants, including evidence of non-compliance in connection with an Asian elephant (Tess) that died at Hawthorn's facility in November 2004. True and correct copies of APHIS's inspection reports are attached as Exhibit E.

7. Since March 2004, APHIS has conducted an extensive search to identify potential donees for the Hawthorn elephants. To date, three of the fifteen remaining

elephants have been placed. Many facilities that initially expressed interest in being donees, including Nashville Zoo, Popcorn Park Zoo, Performing Animal Welfare Society, Riddle's Elephant and Wildlife Sanctuary, and The Elephant Sanctuary in Tennessee, were subsequently unwilling or unable to receive members of the Hawthorn herd at their facilities.

8. In late February 2005, Mr. Cuneo and Hawthorn asked APHIS whether it would reconsider its position regarding the Endangered Ark Foundation. APHIS agreed to evaluate the Endangered Ark Foundation because it was no longer the subject of any AWA investigation.

9. The consent decision and order requires that a donee demonstrate the ability to provide proper care to the Hawthorn elephants in accordance with the Act and the regulations. This means, at a minimum, that Endangered Ark Foundation had to demonstrate that it had quarantine facilities available to separate the Hawthorn elephants, which have been exposed to human tuberculosis, from any other unexposed elephants; employed trained handlers capable of performing trunk washes, administering anti-tuberculosis drugs, and humanely handling elephants; and had the financial ability to care for these special-needs elephants. Additionally, to reduce the risk of tubercular contagion to the national elephant herd and public, and to ensure health and well-being of the Hawthorn elephants, APHIS determined that it would only approve donees that could house the elephants in static (permanently-located, non-traveling) facilities that do not permit the public to be in contact with the animals. I personally evaluated the Endangered Ark Foundation pursuant to these terms of the consent decision and order.

10. The AWA authorizes APHIS personnel to conduct unannounced inspections of AWA-licensed facilities. APHIS officials that conduct AWA inspections include Animal Care Inspectors and Veterinary Medical Officers. Veterinary Medical Officers are doctors of veterinary medicine.

11. I started my evaluation of the Endangered Ark Foundation by reviewing its AWA inspection reports. On twelve occasions between March 4, 2004, and April 4, 2005, APHIS conducted inspections of Carson & Barnes's animals, facilities and records (both traveling and non-traveling sites). True and correct copies of APHIS's twelve inspection reports are attached as Exhibit C. On all but one of those dates, APHIS officials found Carson & Barnes in compliance with the Act and the regulations. On May 28, 2004, APHIS officials documented one non-compliant item in connection with an inspection of one of Carson & Barnes's traveling exhibits, specifically, non-compliance with section 2.131(c)(2) of the handling regulations, which requires that, "during public exhibition, any animal must be handled so there is minimal risk of harm to the animal and public, with sufficient distance and/or barriers between the animals and the public." Specifically, APHIS found that the

> "elephants are bathed in an area within the circus perimeter fence in front of a gate that leads into a mall parking lot. This gate is unlocked and often open and unattended. During bathing, the perimeter fence serves as an inadequate barrier fence. An appropriate barrier fence should be constructed when bathing the animals or appropriate alternative security measures should be employed to prevent harm to the animals or the public."

By the next inspection, Carson & Barnes had corrected the non-compliance. None of the subsequent inspection reports document evidence of any further non-compliance.

Two of the twelve inspections were conducted at the Endangered Ark Foundation facility where the Hawthorn elephants would be housed. Both of those inspection reports, March 2, 2004 and March 5, 2005, show that the facility, animals, and records were in compliance with the Act and the Regulations.

12. On March 17, March 28, April 8, and April 11, 2005, I spoke with Barbara Byrd to determine whether the Endangered Ark Foundation was willing and able to be a donee for two Asian elephants ("Ronnie" and "Gypsy") and one African elephant ("Joy"). During those conversations, Ms. Byrd described the housing and quarantine plans for the Hawthorn elephants, the attending veterinarian's plan and protocol to test and monitor the Hawthorn elephants for tuberculosis, and explained that Dennis Schmidt, D.V.M., a member of the U.S. Animal Health Association, National Tuberculosis Working Group, had agreed to act as a consulting veterinarian for the Endangered Ark Foundation. Ms. Byrd also explained that she was personally familiar with the temperament and behavior of the three elephants that Hawthorn planned to donate to the facility and agreed that the elephants would not travel or be in contact with the public. We also discussed the Endangered Ark Foundation's plan for receiving the elephants as well as a plan for their long-term handling, husbandry and veterinary care.

13. In late May 2005, I spoke with Ms. Byrd regarding the Endangered Ark Foundation's willingness and ability to be a donee for a fourth member of the Hawthorn herd, an Asian elephant ("Debbie"). Ms. Byrd represented that the Endangered Ark

Foundation would care and house this elephant in accordance with the plans and proposals for the other three members of the Hawthorn herd.

14. Thereafter, Dr. David Sabala informed me that the Endangered Ark Foundation's home Animal Care Inspector, Cathy Niebruegge, had confirmed that the Endangered Ark Foundation did have bio-security measures in place to handle and care for four of the Hawthorn elephants, including a waste disposal plan, the availability of separate equipment, housing and outdoor paddock, a program to test and monitor for tuberculosis, and handlers that were capable of humanely handling the elephants. According to Dr. Sabala, Ms. Niebruegge believed that the Endangered Ark Foundation could care for the four elephants in accordance with the Act and the regulations and standards.

15. Based on the above, I believe that the Endangered Ark Foundation demonstrated the ability to provide care to four members of the Hawthorn herd, pursuant to the consent decision and order.

I declare that the foregoing is true and correct to the best of my knowledge and that this declaration was executed on June 15, 2005.

_____
Elizabeth Goldentyer, D.V.M.