UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| DEBRA LYNN LEAHY, <u>et al</u>. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 05-1135 (PLF) |
| | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, <u>et al.</u> | ) | |
| | ) | |
| Defendants. | | |


**PLAINTIFFS' REPLY TO DEFENDANTS' AND DEFENDANT-INTERVENORS'
OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
<u>ORDER /  PRELIMINARY INJUNCTION</u>**

**Introduction**

Plaintiffs challenge a final decision by the United States Department of Agriculture ("USDA") to approve the transfer of four elephants from the Hawthorn Corporation to a Carson & Barnes facility. Although for months immediately prior to this decision, the USDA had repeatedly determined that Carson & Barnes was <u>not</u> a suitable place to serve as a refuge for these animals – who have already been subjected to years of abuse and mistreatment at the hands of Hawthorn and other circuses – and despite graphic evidence that Carson & Barnes, and, in particular a man named Tim Frisco, uses extreme force and brutality to "train" elephants, the USDA suddenly reversed itself and decided to approve the transfer.

Conspicuously, defendants do not deny that Mr. Frisco can be seen on a video tape instructing other Carson & Barnes trainers to strike elephants with bull hooks and electric prods to show them who is "boss," and to make the elephants "scream," <u>see</u> Plaintiffs' Exhibit ("Plf. Exh.") A, nor do defendants deny that Mr. Frisco is now the head of Carson and Barnes' "Endangered Ark Foundation" – to which the elephants are scheduled to be transferred. Rather, defendants insist that plaintiffs are completely foreclosed from asking this Court to review the USDA's decision, and that, in any event, the USDA's decision to permit the transfer of these elephants to Carson & Barnes was eminently reasonable.

However, because plaintiffs clearly may seek review of the USDA's decision here under the Administrative Procedure Act, and because they have amply demonstrate that all of the equities weigh in their favor, plaintiffs are entitled to a preliminary injunction, to allow plaintiffs and the Court to review the full Administrative Record that underlies the agency's final decision to approve this transfer before the Court enters a final judgment in this matter. In addition, because the Hawthorn Corporation has now intervened in the case as a party, plaintiffs request that the Court

enter an order directly enjoining Hawthorn from transferring these elephants to Carson & Barnes until the Court has an opportunity to issue a final decision on the merits.[1]

## BACKGROUND

To place plaintiffs' arguments in context, it is necessary to review the relevant statutory and regulatory framework, the history of these elephants, and the USDA's actions to date.

### A.    The Animal Welfare Act

Congress enacted the Animal Welfare Act ("AWA") "to insure that animals intended for use in research facilities or for exhibition purposes . . . are provided humane care and treatment." 7 U.S.C. § 2131 (1) (emphasis added).    The Act gives the Secretary of the USDA authority to implement its provisions, and instructs the Secretary to promulgate "standards to govern the humane handling, care, treatment, and transportation of animals by . . . exhibitors." 7 U.S.C. § 2143.  Those standards govern the housing, feeding, and transportation of animals, must also provide that "[p]hysical abuse shall not be used to train, work, or otherwise handle animals," and that "[h]andling of all animals shall be done . . . in a manner that does not cause trauma, . . . behavioral stress, physical harm, or unnecessary discomfort." 9 C.F.R. § 2.131(a), (b).

Under the AWA, an exhibitor – including the Hawthorn Corporation – can not lawfully operate in interstate commerce without obtaining a "license" from the USDA. 7 U.S.C. § 2134; see also 9 C.F.R. § 2.1 ("[a]ny person operating or intending to operate as [an] exhibitor . . . must have a valid license") (emphasis added).  To obtain the license, the exhibitor must demonstrate that it is in compliance with the Animal Welfare Act and applicable regulations. Id., §§ 2.1, 2.2, 2.3.   The license is only valid for one year, and the exhibitor must seek renewal of the license from the USDA.

---

[1]Plaintiffs have submitted a revised proposed order for this purpose.

9 C.F.R. § 2.5.   In addition to the authority to issue standards and licenses, the Animal Welfare Act

also provides the USDA with broad authority to establish "such rules, regulations, and orders as [the

agency] deem[s] necessary in order to effectuate the purposes" of the Act.  7 U.S.C. § 2151.

### B.    Factual Background

The Hawthorn Corporation currently holds an exhibitor's license under the AWA.  See Pl.

Ex. 4.  It relies on that license to exhibit elephants and other animals, including, currently, tigers, and

apparently at least one lion.  Cuneo Decl. ¶¶ 2-3 (Interv. Exh. 3).  On April 9, 2003, the USDA filed

charges against Mr. John F. Cuneo, the Hawthorn Corporation, several employees, and others for

violating the Animal Welfare Act with regard to numerous instances of mistreating the elephants.

Indeed, the complaint alleged 47 violations of the minimal standards of the Animal Welfare Act and

requested an order requiring Mr. Cuneo and the Hawthorn Corporation to cease and desist from

violating the AWA and the regulations and standards issued thereunder, assessing civil penalties

against them, and revoking Mr. Cuneo's and the Hawthorn Corporation's license under the AWA.

See USDA Amended Complaint (Plf. Ex. 5).

The USDA's decision to rescue these elephants was unprecedented and heralded by animal

protection and animal rights groups throughout the country, including plaintiff People for the Ethical

Treatment of Animals, particularly in light of the well documented history of mistreatment these

particular animals had suffered through the years.  Thus, as explained in a letter from Plaintiff Leahy

thanking Secretary Veneman for taking this extraordinary action

> The tragedy-plagued Hawthorn has a long history of serious federal Animal Welfare
> Act violations.  Hawthorn's elephants have rampaged numerous times, causing death,
> injury, and property damage, including the gunning down of Tyke by police in 1994
> after she killed her trainer and ran amok in downtown Honolulu.  Several of
> Hawthorn's elephants have died from a human strain of tuberculosis, and a number

3

<u>of its animal handlers have tested positive for this highly contagious bacterial lung disease</u>.  In January 1997, Hawthorn's herd of 18 elephants was quarantined during tuberculosis treatment.  And one of its elephant handlers was <u>convicted of cruelty to animals last October for beating an elephant bloody</u> in Norfolk, VA.

Letter from Leahy to Veneman (Plf. Exh. 6) (emphasis added); <u>see</u> <u>also</u> A Cruel Jungle Tale In Richmond, Chicago Tribune (Jan. 13, 2005) (Plf. Exh. 7).

Indeed, as a result of deteriorating health, one of the Hawthorn elephants – Delphi – animal was confiscated by USDA on November 22, 2003 and sent to the Elephant Sanctuary in Tennessee. TES, Victory for Captive Elephant (Plf. Exh. 8).  Delphi, a 57-year old female, suffered severe chemical burns on her front feet and legs when they were dipped in undiluted formaldehyde by employees of the Hawthorn Corporation. <u>Id</u>.

On March 15, the USDA entered into a Consent Decision and Order with the Hawthorn Corp., under which Hawthorn <u>admitted</u> that it has "<u>failed to establish and maintain programs of adequate veterinary care</u>" for elephants, that it had also failed to handle elephants "in a manner that did not cause <u>behavioral stress</u>" to the elephants, and failed to handle elephants in a manner that "did not cause <u>physical harm</u>" to the animals.  Pl. Ex. F (emphasis added).  Pursuant to that Decision, Hawthorn was also required to relinquish possession of all of the elephants in its care, and the USDA was to determine, prior to August 15, 2004, which facilities had "demonstrated the ability to provide proper care" for the Hawthorn elephants "in accordance with the [AWA] and the Regulations," and hence should be "approved" as suitable placement facilities for the animals.  <u>Id.</u>.  Until the elephants are placed with adequate facilities approved by the USDA, Hawthorn is required to provide each of the elephants "humane care (including veterinary care), husbandry, and housing."  <u>Id.</u>

In the spring of 2004, the Hawthorn Corporation agreed to place two of the elephants,  Misty

and Lota, with The Elephant Sanctuary, which has consistently been approved by the USDA as a facility that can provide the elephants with the care they need.   Indeed, the Elephant Sanctuary is world renowned for the freedom it provides elephants to roam on thousands of acres of land, unchained for the first time in their lives, to engage in natural elephant behavior, and to freely interact with other elephants. See <www.tappedintoelephants.com/asp/index.php#>. Unfortunately, by the time Lota was finally transferred to the Sanctuary, she was so ill with tuberculosis, that she died after only two months at the Sanctuary.  See Trunklines, Lota's Saga (Plf. Exh. 9).  Her companion, Misty, who also has tuberculosis, remains at the Sanctuary.  A third Hawthorne elephant, Tess, was also designated to be sent to The Elephant Sanctuary, but died in November of 2004. According to the USDA, her death also stemmed from Hawthorn's mistreatment.  See Goldentyer Decl. at ¶ 6 (Def. Exh. A) ("In addition to the violations that lead to the consent decree and order, APHIS officials have continued to document evidence of further violations by Mr. Cuneo and Hawthorn in connection with their handling, husbandry, and care of elephants, including evidence of non-compliance in connection with an Asian elephant (Tess) that died at Hawthorn's facility in November 2004") (emphasis added).

Regarding the remainder of the elephants, the USDA made it clear that there is a "very real possibility that the Elephant Sanctuary and PAWS would be the only facilities that met the requirements of the Consent Decision and Order . . .."  Letter to Boley from Juarez (May 21, 2004) (Plf. Exh. D).  In fact, as plaintiffs' explained in their opening brief,  the agency rejected – on three occasions – Carson & Barnes' Endangered Ark Foundation as a donee for the Hawthorn elephants, on the grounds that it is "unable to demonstrate the ability to provide proper care for the elephants in accordance with the Act and Regulations."  See Pl. Exhs. C, D, E.  On the other hand, The

5

Elephant Sanctuary – which the USDA has consistently approved as an appropriate place for the remaining elephants – has made it absolutely clear to both the USDA and the Hawthorn Corp. that it is willing to accept the remaining eleven female elephants. Letter from Mr. Stagg to Ms. Juarez at 2 (May 24, 2005) (Plf. Exh. 10) ("the Sanctuary has stated unequivocally that it will take eleven of the twelve remaining Hawthorn elephants").[2]

The elephants approved for donation to Carson & Barnes' Endangered Ark Foundation are Debbie, Joy, Gypsy, and Ronnie. Cf. Cuneo, Hawthorn Herd (Plf. Exh. 11). Debbie is one of the elephants that rampaged in 2001 in North Carolina. See NBC6, Stampeding Circus Elephant: Repeat Offender (Plf. Exh. 12). A Hawthorn Corporation handler faced cruelty charges for his beating of Joy in Virginia. See Roy, Circus Trainer Convicted (Plf. Exh. 13).

## **ARGUMENT**

As this Court recently noted, "Plaintiffs are not required to prevail on each of [the Holiday Tours] factors," but rather, these "factors must be viewed as a continuum, with more of one factor compensating for less of another." Bradshaw v. Veneman, 338 F Supp.2d 139 (D.D.C. 2004) (relying on Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843-45 (D.C. Cir. 1977)). Thus, "[t]he necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors" and "injunctive relief may be granted 'with either a high probability of success and some injury, or vice versa.'" Id. (quoting Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974

---

[2] Unfortunately, the Sanctuary is unable to accommodate the needs of the one male elephant.

(D.C. Cir. 1985)).

Here plaintiffs have demonstrated a high likelihood of success on the merits, as the USDA very recently concluded that Carson & Barnes' Endangered Ark is "unable to demonstrate the ability to provide proper care for the elephants," Plf. Exh. E, or "the ability to comply with the [AWA] and Regulations," Plf. Exh. F, yet now has abruptly changed its position and suddenly concluded that this facility is in fact fully in compliance with the Animal Welfare Act and those standards, implementing regulations, and therefore is an appropriate place for donation of these animals. The USDA's drastic change in position is the height of arbitrary and capricious agency action. See Motor Vehicle Manufacturers Ass'n v. State Farm Automobile Ins. Co., 463 U.S. 29, 57 (1983) ("an agency changing its course must supply a reasoned analysis"). Indeed, given the evidence before the USDA of Carson & Barnes' clearly abusive training techniques – including video footage of Mr. Frisco's elephant training session where he instructs trainers to hit the elephants with bull hooks until they scream – USDA's decision that this particular facility will nevertheless provide these animals the humane care and handling that is required under the AWA "runs counter to the evidence before the agency." State Farm, 463 U.S. at 43; see also 9 C.F.R. § 2.131(a) (2) ("[p]hysical abuse shall not be used to train, work, or otherwise handle animals"). Plaintiffs have also demonstrated that both they and the animals they seek to protect will suffer irreparable harm if the four elephants are shipped to Carson & Barnes' Endangered Ark, e.g., because plaintiffs clearly will never be able to see these elephants again and the animals will be subjected to abusive mishandling at the hands of Carson & Barnes. For these reasons, and because there is an alternative solution to the plight of these animals, plaintiffs respectfully request a preliminary injunction to prohibit the transfer of the animals to Carson &

7

Barnes until plaintiffs and this Court have had an opportunity to review the entire Administrative Record and, on that basis, the Court can issue a final disposition of this case.

## I.    PLAINTIFFS HAVE DEMONSTRATED ADEQUATE STANDING

To demonstrate standing, a plaintiff must show that she has suffered injury-in-fact that is fairly traceable to the defendants' conduct, and that is capable of judicial redress. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); ASPCA v. Ringling Bros. And Barnum & Bailey Circus, 317 F.3d 334, 336 (D.C. Cir. 2003).  In addition,  as long as one plaintiff has sufficient Article III standing, it is not necessary for the Court to decide the standing of the other additional plaintiffs.  Animal Legal Defense Fund, et al. v. Glickman, 154 F.3d 426, 432 (D.C. Cir. 1998).

Moreover, it is well established that when considering a motion for a preliminary injunction, a court will not hold the plaintiffs to the same degree of proof of standing that is required where the parties move for summary judgment.  See, e.g., Am. Fed'n of Gov't Employees v. District of Columbia, 2005 WL 1017877, * 12 (D.D.C. 2005); Cereberonics, Inc. v. Garrett, 1991 WL 45738, * 5 n.2 (D.D.C. 1991); Heartland Academy Comty. Church v. Waddle, 335 F.3d 684, 689 (8th Cir. 2003).  Nevertheless, here, plaintiff Leahy's verified complaint amply demonstrates that she has standing to pursue her claims against the USDA.

As the Court of Appeals stressed in its *en banc* ruling in ALDF v. Glickman, 154 F.3d 426, 432 (D.C. Cir. 1998), "[t]he Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing." 154 F.3d at 432 (emphasis added).  Thus, as the Supreme Court recognized in Defenders of Wildlife, 504 U.S. at 562-63, and reiterated in Friends of the Earth, Inc. v. Laidlaw,

528 U.S. 167, 183 (2000) at 183, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing" (emphasis added). As the Supreme Court has further emphasized, it is also "clear that the person who observes or works with a particular animal" suffers injury in fact when that animal is harmed.  Lujan, 504 U.S. at 566 (emphasis added).

These principles apply with full force to the allegations of injury by the individual plaintiffs in this case.  Thus, Ms. Leahy verifies, under penalty of perjury, that for many years, she has "followed the status of the Hawthorn elephants," and that she has "been in the forefront of advocating for their protection, rescue, and placement with a sanctuary."  Verified Complaint ¶ 3.  In addition, she states that she "had the pleasure of visiting the elephants and getting to know them personally," and that, as a result, "she has grown extremely fond of them, and has formed a strong, personal attachment to these particular animals."  Id. (emphasis added).  These assertions of a sufficient, particularized interest in these particular animals are indistinguishable in kind from the interests in captive animals that was held sufficient for standing in both ALDF v. Glickman, supra, and in ASPCA v. Ringling Bros., 317 F.3d 426 (D.C. Cir. 2003).[3]

In addition, Ms. Leahy asserts that the USDA's recent decision to reverse its previous decision that Carson & Barnes is not an acceptable location for the placement of these animals, and instead to approve the placement of the animals at a Carson & Barnes' facility, injures her "aesthetic and emotional interests in these particular animals because it means either that she will never be able to see the animals again or that, when she sees them, she will suffer aesthetic harm

_____

[3]As Ms. Leahy also states, Complaint ¶ 3,  Mr. Cuneo recently invited her to his facility to visit the elephants.  See also Letter from Mr. Cuneo to Ms. Leahy (April 17, 2005) (Pl. Ex. 14).

9

by viewing animals whose demeanor and spirit have been further impaired because they have

been removed from their surrogate family and are living in an environment that is abusive and

unhealthy for them." Verified Complaint ¶ 4. Therefore, to avoid such aesthetic injury, Ms.

Leahy will have to make the choice to refrain from visiting these animals with whom she has

formed a close personal bond. Id. This is precisely the kind of injury that the D.C. Circuit held

was sufficient in Ringling Bros.

　　　Ms. Leahy also satisfies the causation prong of Article III standing because she has

asserted that her injury is the result of the USDA's reversal in decision here, Complaint ¶ 4, and

that her injuries will be redressed if the Court enjoins the transfer of the elephants to Carson and

Barnes, and the animals are instead "relocated to a sanctuary or other place that is in full

compliance with the Animal Welfare Act and does not beat its elephants with electric prods and

bull hooks . . . or deny them veterinary care," Complaint ¶ 5, and that in that event, she "would

visit them as often as possible." Id. These assertions are extremely similar in kind to those that

were sufficient in both the Glickman case and in Ringling Bros. Moreover, there is absolutely no

question that if the elephants are placed at the Elephant Sanctuary, Ms. Leahy would be permitted

access to them.[4] There also is no merit to the intervenors' argument that plaintiffs' claims fall

outside the zone of interest. Here, the appropriate zone of interest is that which underlies

Animal Welfare Act, since, as demonstrated below, plaintiffs' challenge a licensing decision that

has been made by the USDA under that Act. Plaintiffs' allegations fall squarely within the

interests that are embodied in the Animal Welfare Act. See 7 U.S.C. § 2131 (purpose of the

---

　　　[4] Indeed, Ms. Leahy once worked at the Elephant Sanctuary and has been allowed to visit
the animals there in the past.

statute is "to insure that animals intended . . . for exhibition purposes . . . are provided humane care and treatment"); see also Glickman, 154 F.3d at 438.

II.    **PLAINTIFFS HAVE MADE A STRONG SHOWING OF SUCCESS ON THE MERITS.**

    A.    **Plaintiffs Have Challenged A Final Agency Action That Is Reviewable Under The Administrative Procedure Act.**

The Administrative Procedure Act provides that this Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  The APA's definition of "agency action" in turn is broad and "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13) (emphasis added).  As this Court has noted, "[a]lmost any action taken by an agency is either a rule, an order, an adjudication or 'the equivalent ... thereof,' . . . which, if final, is subject to judicial review" and "[t]here is a strong presumption that agency action is reviewable by the courts," which "cannot be overcome without clear and convincing evidence that Congress intended otherwise."  Milk Industry Found. v. Glickman, 949 F. Supp. 882, 893 (D.D.C. 1996) (internal citations omitted).

As explained, supra, at the heart of the AWA is the statutory mandate that the USDA "insure" the "humane care and treatment" of various captive animals including those used "for exhibition purposes."  7 U.S.C. § 2131(1).  This mandate is carried out in part by USDA's licensing of "dealers and exhibitors" who demonstrate their facilities "comply with the standards promulgated by" USDA. 7 U.S.C. §§ 2133, 2134.  Thus, exhibitors such as the Hawthorn Corporation are only permitted to transport and exhibit animals in compliance with the USDA's

AWA regulations and standards in order to maintain their license.

Thus, the USDA's decision that four of the twelve Hawthorn elephants can be placed at Carson & Barnes' Endangered Ark Foundation is clearly an agency action – i.e., a license, a sanction, or an order – that is reviewable under the APA.  See Industrial Safety Equipment Ass'n v. EPA, 837 F.2d 1115, 1117 (D.C. Cir. 1988) (The categories of agency action under the APA "are imprecise, and courts have made the threshold determination of reviewable agency action on a case-by-case basis"); La Compania Ocho Inc. v. U.S. Forest Service, 874 F. Supp. 1242, 1247 n. 1 (D. N.M. 1995) (noting the Forest Service's decision to halt logging "may be characterized as either an 'order,' the denial of a 'license,' or a 'sanction.'") declined to follow on other grounds, Williams v. Glickman, 936 F. Supp. 1 (D.D.C. 1996).

Indeed, agency action under the APA includes a "license" which is defined as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  5 U.S.C. § 551(8).  Here, Hawthorn's license was changed or modified by the USDA by virtue of an agreement reached with Mr. Cuneo and the Hawthorn Corporation under the Consent Decision. This modification requires the Hawthorn Corporation to relinquish possession of all of its elephants and to place them "with persons who have demonstrated the ability to provide proper care for said animals in accordance with the [Animal Welfare] Act and the Regulations" and it is further required that the USDA "approve[]" any such facility as a place that meets these specific criteria.  Consent Decision, Order ¶ 3 (Plf. Exh. A).   Indeed, if the elephants are not placed with an entity that is approved by the USDA, Hawthorn will lose its current license – under which it exhibits other animals.

The USDA has further modified Hawthorn's license by specifically approving the transfer

of the four elephants to Carson & Barnes.  Therefore, this determination is clearly "the whole or a part of an agency permit, . . . approval, registration, . . . or other form of permission."  5 U.S.C. § 551(8) (emphasis added).  Thus, for example, in Atlantic Richfield Co. v. United States, the D.C. Circuit found that "short-term and restricted" agency "approvals clearly fell within the broad definition of license in the APA."  Atlantic Richfield Co. v. United States, 774 F.2d 1193, 1200 (D.C. Cir. 1985).  There the Maritime Administration waived certain prohibitions on domestic trade by federally subsidized ships, by granting the plaintiffs "approval from [the agency] to enter" into domestic oil trade, and the plaintiffs sued when the agency terminated its "domestic trade approvals."  Id. at 1195.  The court held that, as the definition of license includes "*approval*" and "*other form of permission*," "the [Maritime Administration] approvals are clearly licenses."  Id. at 1200 n. 28 (emphasis in original) (relying on Blackwell College of Business v. Attorney General, 454 F.2d 928, 932 (D.C. Cir. 1972)).  Similarly, the USDA's accreditation of veterinarians has been found to constitute a reviewable "license" under the APA, because "[t]he accreditation is, at a minimum, approval, or permission to act as an accreditated veterinarian."  See Hagus v. Espy, 53 Agric. Dec. 443, 453, 1994 WL 733120, *8 (1994).  Likewise, here the USDA's decision to permit the Hawthorn Corporation to transfer four elephants to Carson & Barnes' Endangered Ark Foundation is a "form of permission" for Hawthorn to place the elephants there.  Atlantic Richfield, 774 F.2d at 1200 n. 28; see also New York Pathological And X-Ray Laboratories, Inc. v. INS, 523 F.2d 79, 80, 82 (2d Cir. 1975) (INS's "designation . . . of certain laboratory facilities as those approved to conduct required medical examinations of aliens," "constituted a license" under the APA.); Moore v. Madigan, 789 F. Supp. 1479 (W.D. Mo. 1992) (USDA "claims that [section 558(c) of the APA which is applicable to licenses] does

13

not provide an independent right to a full adjudicatory hearing before a license is revoked" but

only provides plaintiff with "the opportunity to achieve compliance with the regulations"); aff'd

990 F.2d 375, 379 (8th Cir. 1993). Accordingly, plaintiffs may challenge that agency action

under the APA.[5]

For similar reasons, the USDA's decision is also an "order" under the APA, since it is "a

part of a final disposition . . . of an agency in a matter other than rule making but including

licensing." 5 U.S.C. § 551(6) (emphasis added). As discussed above, USDA's decision to allow

the Hawthorn Corporation to place four elephants at Carson & Barnes' Endangered Ark is the

"final disposition" or modification of the Hawthorn Corporation's most recent exhibitor's license

with respect to at least four elephants. Thus, USDA's decision fits well within the expansive

definition of "order" that has long been recognized in the D.C. Circuit. See CADC 79-71 City of

Rochester v. Bond, 603 F.2d 927, 930-31 (D.C. Cir. 1979) (Holding that decision that

construction of a radio antenna tower would not be a hazard to air navigation was an order under

the "quite expansive[]" definition in the APA); Doe v. Rumsfeld, 341 F. Supp. 2d 1, 12 (D.D.C.

2004) (An agency' decision to approve a vaccine based on "a pre-determined standard" is an

"order" under the APA). Furthermore, based on facts quite similar to those present here, the

D.C. Circuit determined that a four -page opinion letter by the FTC denying a request for prior

approval – that was required by a consent decree between the parties – was "an informal

adjudication" – i.e. an agency act other than rulemaking – reviewable under the APA. Dr Pepper

---

[5] To the extent that any characterization by the Court of the USDA's decision as a license
may trigger any rights or obligations under the APA, it is plaintiffs' view that those rights and
obligations have been expressly waived in the Consent Decision by both the USDA and
Hawthorn.

/Seven-Up Companies v. FTC, 991 F.2d 859, 862 (D.C. Cir. 1993).

Finally, the USDA's decision is also an agency action because it constitutes a "sanction" under the APA, because it is "the whole or part of an agency" (A) prohibition, requirement, limitation, or other condition affecting the freedom of a person; (B) withholding of relief; (C) imposition of penalty or fine; (D) destruction, taking, seizure, or withholding of property; (E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (F) requirement, revocation, or suspension of a license; or (G) taking other compulsory or restrictive action." 5 U.S.C. § 551(10). Thus, USDA's decision requiring the Hawthorn Corporation to donate four elephants to Carson & Barnes' Endangered Ark is a sanction within the meaning of the APA.[6]

**B.     _Heckler v. Chaney_ Does Not Bar Review Of The USDA's Decision.**

Defendants wrongly argue that the Supreme Court's decision in Heckler v. Chaney, 470 U.S. 821, 830 (1985) somehow precludes judicial review of the USDA's decision. Plaintiffs are not challenging the USDA's enforcement decision. Rather as explained, supra, plaintiffs challenge the agency's decision to permit Hawthorn to transfer four of its elephants to Carson & Barnes' Endangered Ark, as a condition of being permitted to continue to renew its license under the Animal Welfare Act.

Indeed, in Chaney, the Supreme Court noted that, in contrast to an agency's decision not

---

[6] The Second Circuit has gone so far as to not only find an agency's penalty imposed against a regulated entity to be a "sanction" within the meaning of agency action under the APA, but to also find that a Court has the authority to modify that sanction. See Arthur Lipper Corp. v. SEC, 547 F.2d 171 (2d Cir. 1977). Plaintiffs here are only asking the Court to enjoin the USDA's decision or sanction from operation until the Court can decide the merits of plaintiffs' case and determine whether USDA's decision should be set aside as arbitrary and capricious.

to enforce where the agency "generally does not exercise its *coercive* power over an individual's liberty or property rights," "when an agency *does* act to enforce, <u>that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner</u>" that is reviewable in Court.  <u>Chaney</u>, 470 U.S. at 831-32 (first emphasis in original, second emphasis added).  Here, the USDA has purported to implement its responsibilities under the AWA by requiring the Hawthorn Corporation to transfer its elephants to Carson & Barnes – a decision that certainly "provides a focus for judicial review."  <u>Chaney</u>, 470 U.S. at 832; <u>see</u> <u>also</u> <u>Schering Corp. v. Heckler</u>, 779 F.2d 683, 686 (D.C. Cir. 1985)  (Recognizing the reviewability of an agency settlement with a potential regulatee) (emphasis in original); <u>New York State Dep't of Law v. FCC</u>, 984 F.2d 1209, 1214 (D.C. Cir. 1993) (when an agency makes "a formal legal decision," "[r]eview of such a decision, which is uniquely the role of the court, in no way impinges upon [the agency's enforcement] discretion"); <u>Dr Pepper /Seven-Up Companies v. FTC</u>, 991 F.2d 859, 862 (D.C. Cir. 1993) (Reviewing agency letter denying approval for an acquisition where a settlement agreement required pre-approval by the agency before the acquisition could occur);  <u>MCI Telephone Corp. v. FCC</u>, 917 F.2d 30 (D.C. Cir. 1990).

Moreover, the USDA clearly acknowledges that there is law to apply here.  It insists that the facility to which the animals are to be transferred must "demonstrate the ability to provide proper care to the Hawthorn elephants in accordance with the Act and the regulations," that it must have "quarantine facilities," "adequately trained handlers," "the ability to administer anti-tuberculosis drugs," and the "financial ability to care for these special-needs elephants." Goldentyer Decl. at ¶ 9; Def. Mem. at 3.  Accordingly, <u>Chaney</u> does not bar review of this decision and defendants have not overcome the "strong presumption that agency action is

reviewable by courts." <u>Milk Industry Found</u>., 949 F. Supp. at 893; <u>see also</u> <u>Hondros v. United</u>
<u>States Civil Service Commission</u>, 720 f.2d 278 (3d Cir. 1983) (agency's self-imposed criteria
may serve as the relevant "law to apply"); <u>McAlpine v. United States</u>, 112 F.3d 1429 (10th Cir.
1997) (regulatory factors provided law to apply for purposes of judicial review).

     **C.**    **The USDA's Decision Is Arbitrary And Capricious**

     Again, under the APA, a Court "shall ... hold unlawful and set aside agency action,
findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law." 5 U.S.C. § 706(2). The D.C. Circuit has found that the
"'scope of review' provisions of the APA [in section 706] . . . are cumulative" and "the 'arbitrary
or capricious' provision" in particular "is a catchall, picking up administrative misconduct not
covered by the other more specific paragraphs," thus "enabling the courts to strike down, as
arbitrary, agency action that is devoid of needed factual support." <u>Ass'n of Data Processing v.</u>
<u>Board of Governors</u>, 745 F.2d 677, 683 (D.C. Cir. 1984).

     Here, the only thing the USDA has offered to support its 180 degree change in position is
a <u>post hoc</u>, unsigned declaration. <u>See</u> Goldentyer Decl. (Def. Exh. A). However, agency
decisions are to be judged on the basis of the administrative record – <u>i.e.</u> the information before
the agency at the time it made its decision, <u>Boswell Memorial Hospital</u>, 749 F.2d at 792 – as well
as the decision documents themselves, <u>Vincent Industrial Plastics, Inc. v. NLRB</u>, 209 F.3d 727,
739 (D.C. Cir. 2000) ("The problem here is that counsel's argument is nowhere to be found in
the orders under review"). The D.C. Circuit has made it clear that these requirements also apply
to motions for preliminary injunctions in cases under the APA. <u>Am. Bioscience, Inc. v.</u>
<u>Thompson</u>, 243 F.3d 579, 582 (D.C. Cir. 2001) ("this case too comes to us upon the denial of a

preliminary injunction" and "the administrative record was never filed, despite APA § 706's direction that judicial review shall be performed by reviewing the whole record or those parts of it cited by a party").

Defendants have not filed the Administrative Record with the Court, or even provided the Court and the parties with the records that are contemporaneous with the agency's decision to approve Carson & Barnes' Endangered Ark Foundation as a donee for four elephants.  Therefore, the declaration of Ms. Goldentyer has no place in this case under the APA to the extent it attempts to justify or explain the USDA's decision.  See Anacostia Watershed Soc'y v. Babbitt, 871 F. Supp. 475, 486 (D.D.C. 1994) (an agency's action "'must be upheld, if at all, on the basis articulated by the agency itself' at the time of decision, not post hoc rationalizations"); Am. Textile Manufacturers v. Donovan, 452 U.S. 490, 539 (1981) ("the post hoc rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action"); see also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419 (1971) (Litigation affidavits "do not constitute the 'whole record' complied by the agency: the basis for review required by § 706 of the Administrative Procedure Act").

Furthermore, beginning the day this case was filed, plaintiffs have requested the Administrative Record or at least the decision documents from counsel for defendants.  See Letter from Sanerib to Campbell (Plf. Exh. 15).  Thus, defendants' failure to file anything even approaching the Administrative Record for this case should not prejudice plaintiffs' ability to obtain relief in this matter.

 Moreover, even if the Court could consider Ms. Goldentyer's post hoc rationalizations, the USDA has entirely failed to provide any rational justification for its complete reversal here in

18

deciding to approve Carson & Barnes' Endangered Ark Foundation after repeatedly concluding that this facility was "unable to demonstrate the ability to provide proper care for the elephants," Plf. Exh. D, or "the ability to comply with the [AWA] and Regulations,"  Plf. Exh. E, and considering the extremely relevant evidence of the abusive methods used by Carson and Barnes – and particularly Mr. Frisco – to train elephants.   Indeed, although the Hawthorn Corporation predictably complains that the video footage of Mr. Frisco's "training" session is "fabricated" and "doctored," we note that Hawthorn does <u>not</u> dispute that Mr. Frisco is in fact depicted on this footage, nor does it dispute that this is the same Mr. Frisco who is in charge of the elephants at the "Endangered Ark Foundation" to which the Hawthorn elephants are scheduled to be sent.

More importantly, the USDA does not deny the validity of this evidence.  Indeed, the USDA itself relied on this very evidence to conduct a previous investigation of Carson & Barnes, and to fine the company $400 for "failing to handle the elephant as carefully as possible in a manner that does not cause stress or physical harm during training."  <u>See</u> Janis Thornton, Treatment of Circus Animals In Dispute, Frankfort Times (Aug. 18, 2003) (Plf. Exh. 16); <u>see also</u> AP, Activists Accuse Circus of Abusing Animals, Winchester News Gazette (Aug. 18, 2003) (Plf. Exh. 17); Bryd Decl. ¶¶ 16-18 (Interv. Exh. 4).  Therefore, it is absolutely clear – and the USDA does not deny that this evidence of Carson & Barnes' "training" methods was before the agency when it made its about-face to approve the transfer of the Hawthorn elephants there.

However, this footage demonstrates that Mr. Frisco does <u>not</u> handle elephants as "carefully as possible" or in a manner that "does not cause trauma," "physical harm," or "unnecessary discomfort."  9 C.F.R. § 2.131 (a)(1).  On the contrary, not only does Mr. Frisco apparently believe that it is necessary to make elephants "scream" to control them, but he also

19

seemingly has no qualms about hitting them with bull hooks merely because his new elephant

handlers are not paying attention to him.  See Pls. Exhs. A, B.  Thus, the USDA's decision that

the Endangered Ark – at which Mr. Frisco is a high level official – can "properly care" for Joy,

Debbie, Gypsy, and Ronnie and will properly handle these animals as "carefully as possible in a

manner that does not cause trauma, . . . physical harm, or unnecessary discomfort," 9 C.F.R. §

2.131 (a)(1), is arbitrary and capricious because it "runs counter to the evidence before the

agency."  State Farm, 463 U.S. at 43.[7]

     Also before the agency is an affidavit – taken by a USDA investigator – submitted by the

former Carson & Barnes employee who actually videotaped Mr. Frisco beating elephants.  See

Pl. Ex. 18.  As that affidavit explains, Mr. Frisco not only beat the elephants during training

sessions, but also routinely beat them while giving them veterinary care, including tuberculosis

testing – the very testing that the animals will be given by Carson & Barnes once the USDA-

approved transfer is  complete.  See USDA Affidavit (Pl. Ex. 18) (describing various TB testing

sessions in which Mr. Frisco and others maliciously beat the elephants with bull hooks and

electric prods when they would not cooperate with the testing); see also id. at 7 (explaining that

the video "shows a typical elephant training session," and that "the actions seen on the video

were what I witnessed on a routine basis") (emphasis added).

     Nevertheless, despite this extremely relevant evidence of the way Carson & Barnes treats

elephants, there is absolutely no explanation as to how the USDA could possibly have concluded

---

[7] Defendant-intervenors' claims that Carson & Barnes has never been charged with a violation of the AWA, Interv. Mem. at 12, rings hollow given that USDA has acknowledged here that Hawthorn continues to be in violation of the AWA but has not charged Hawthorn for these violations.  Def. Mem. at 13.

that this entity was nevertheless a suitable place of refuge for the Hawthorn elephants.  See also 9

C.F.R. § 2.131 (a)(1) ("[h]andling of all animals shall be done as expeditiously and carefully as

possible in a manner that does not cause trauma, . . . physical harm, or unnecessary discomfort").

This footage demonstrates that Mr. Frisco does not handle elephant as "carefully as possible" or

in a manner that "does not cause trauma," "physical harm," or "unnecessary discomfort."  9

C.F.R. § 2.131 (a)(1).  Not only does Mr. Frisco appear to believe that it is necessary to make

elephants "scream" to control them, but he also seemingly has no qualms about hitting them with

bull hooks merely because his new elephant handlers are not paying attention to him.  Defendant-

intervenors neither refute that it is Mr. Frisco depicted in the video, nor that he is a high level

official at the Endangered Ark Foundation.  See Bryd Decl. (Interv. Exh. 4).  Thus, the USDA's

decision that the Endangered Ark – at which Mr. Frisco is a high level official – can "properly

care" for Joy, Debbie, Gypsy, and Ronnie and will properly handle these animals as "carefully as

possible in a manner that does not cause trauma, . . . physical harm, or unnecessary discomfort,"

9 C.F.R. § 2.131 (a)(1), is arbitrary and capricious because it "runs counter to the evidence before

the agency."  State Farm, 463 U.S. at 43.[8]

Thus, the agency has failed to "articulate a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'"  State Farm, 463

U.S. at 43, quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).[9]

---

[8] Defendant-intervenors' claims that Carson & Barnes has never been charged with a
violation of the AWA, Interv. Mem. at 12, rings hollow given that USDA has acknowledged here
that Hawthorn is in violation of the AWA but has not charged Hawthorn for these violations.
Def. Mem. at 13.

[9] Defendants' complete failure to provide the decision documents let alone anything
approaching the Administrative Record can only be taken to indicate that these materials are

21

Indeed, in reviewing the agency's decision, this Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." State Farm, 463 U.S. at 43.   As plaintiffs explained in their opening brief, normally an agency's decision will be found to be arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence before the agency" – as has clearly occurred here.     Therefore, by this default alone plaintiffs have demonstrated quite a high likelihood of success on the merits. See American Lung Ass'n v. EPA, 134 F.3d 388, 392 (D.C. Cir. 1998) (an agency must "cogently explain why [it] has exercised [its] discretion in a given manner").[10]

Defendants' position that The Elephant Sanctuary is "unable or unwilling to accept the elephants at issue in the instant case," Def. Mem. at 4, could not be further from the truth.  The Elephant Sanctuary has gone to great lengths to convince the USDA and the Hawthorn Corporation that it is quite willing, able, and interested in providing a home for all of the female Hawthorn elephants.  See Letter from Mr. Stagg to Ms. Juarez at 1 (May 24, 2005) (Plf. Exh. 10) ("It is absolutely not true that the Sanctuary has declined to accept any more elephants, and Ms. Buckley and I are baffled at how you reached that understanding"); Kaufman, Illinois Elephants'

_____

quite harmful to defendants' position, which is why they have elected not to produce them at this stage in the proceedings.  See International Union v. NLRB, 459 F.2d 1329, 1336 (D.C. Cir. 1972) ("when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him") (emphasis added).

[10] Moreover, this evidence is only bolstered by Carson & Barnes' well documented mistreatment of elephants.  See Verified Complaint ¶ 25.  These infractions include the death of a juvenile elephant named Jeannie, a citation for "failing to use proper care" while operating a transport trailer, numerous citations for failing to maintain transport trailers, and the use of physical abuse to train or handle elephants.  Id.; see also Bryd Decl. ¶ 16 ("Carson & Barnes Circus has been the subject of two enforcement actions, both of which settled").

Fate Remains Uncertain, Washington Post (Plf. Ex. 19) ("We raised $2.5 million for a new barn

so we could take the Hawthorn elephants," said Carol Buckley, executive director of the Elephant

Sanctuary").  Yet, just as the USDA's change of position with respect to Carson & Barnes'

Endangered Ark Foundation has gone unexplained, so too has the agency's position with respect

to The Elephant Sanctuary.

In fact, this position appears to be the only one that the USDA can argue at this point

given the agency has already endorsed the Elephant Sanctuary as a recipient for the remaining

Hawthorn elephants, Plf. Exh. E (the USDA stated it is a "very real possibility that the Elephant

Sanctuary and PAWS would be the only facilities that met the requirements of the Consent

Decision and Order"), and has already placed three Hawthorn elephants at this facility – Delhi,

Lota, and Misty.  See Plf. Exhs. 8, 9.  Court's frown upon such "conclusory dismissal[s]" by

agencies of a rationale for granting or denying approval.  See Dr Pepper /Seven-Up Companies v.

FTC, 991 F.2d 859, 865 (D.C. Cir. 1993) (In reviewing the agency's letter, the Court held that the

FTC's "conclusory dismissal" of a rationale for granting the approval was arbitrary and

capricious.).

USDA's misleading statements about the Elephant Sanctuary are merely a denial of the

inevitable:  in two months The Elephant Sanctuary will be able to take all of the Hawthorn

females and as Defendant acknowledges "if Plaintiffs were to prevail, the elephants would be

required to stay in Hawthorn's custody for months, until the Elephant Sanctuary was ready to

receive the elephants."  Def. Mem. at 14 (emphasis added).  Thus, whatever the last ditch effort

was to avoid the inevitable here, it surely was not undertaken in compliance with the APA, but

rather was a "conclusory dismissal" of a very valid rationale for denying the approval of Carson

23

& Barnes' Endangered Ark Foundation.[11]

Thus, as plaintiffs have raised questions "so 'serious, substantial, difficult and doubtful, as to make them a fair ground for litigation'," which is "ordinarily [] enough" to warrant injunctive relief. See Al-Joudi v. Bush, --- F. Supp. 2d --- , 2005 WL 774847, *5 (D.D.C. 2005) (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953)).

## III.    THE EQUITIES OVERWHELMINGLY WEIGH IN FAVOR OF MAINTAINING THE *STATUS QUO*

As plaintiffs demonstrated in their opening brief, at 9-16, the equities weigh heavily in favor of maintaining the status quo at least until the Court has an opportunity to render a final disposition in this case. Indeed, not only will the plaintiffs irreparably lose their ability to ever see these elephants again if they are shipped to Carson & Barnes' Endangered Ark, Verified Complaint ¶ 4; see also Bryd Decl. ¶ 42 (Interv. Exh. 4) ("EAF is not open to the public, and does not intend to grant access to Debra Leahy"), but the animals themselves will also be irreparably harmed as the footage of Endangered Ark official Mr. Frisco's treatment of elephants demonstrates. Plf. Exh. A; Bradshaw Declaration ¶ 8 (Plf. Exh. 2) ("separating these elephants from each other is predicted to be extremely stressful and subsequently deleterious to the elephants"); Derby Declaration ¶ (Plf. Exh. 3).

In response, the Hawthorn Corporation and Mr. Cuneo, claims severe financial harm if he

---

[11] It is also arbitrary and capricious for the USDA to approve Carson & Barnes' Endangered Ark Foundation as a donee for elephants because under the plain language of the Consent Decision in order for a facility to be approved it had to be "previously approved" by USDA before August 15, 2004. See Consent Decision, Order ¶ 3 ("By August 15, 2004, respondents shall place all of their elephants, by donation with persons who have demonstrated the ability to provide proper care for said animals in accordance with the Act and the Regulations, and whom [the USDA] has previously approved as donees.") (emphasis added).

is required to care for these animals until this Court can decide this case on the merits, or the elephants can be placed elsewhere, including at the Elephant Sanctuary..  Interv. Mem. at 34-35. Yet, these allegations of harm completely ignore that the <u>reason</u> the Hawthorn Corporation has to pay to maintain the elephants is because of the 19 violations of the AWA the company voluntarily agreed it committed.  Consent Decision, Order ¶ 7 (Plf. Exh. F).  Under the terms of that Decision, the Hawthorn Corporation "<u>agreed</u> to provide to each of the elephants, humane care (including veterinary care), husbandry, and housing <u>until such time as each and every elephant is placed</u> in accordance with the provisions of paragraph 3."  Consent Decision, Order ¶ 7 (Plf. Exh. F) (emphasis added); <u>see also</u> Cuneo Decl. ¶ 24 (we "are responsible for and <u>committed to providing housing, food, and other care to these elephants</u>").

Courts generally reject such claims of harm that are "self-inflicted," <u>see</u> <u>Salt Lake Tribune Publishing Co. v. AT&T Corp.</u>, 320 F.3d 1081, 1106 (10th Cir. 2003); <u>Barton v. District of Columbia</u>, 131 F. Supp. 2d 236, 247 (D.D.C. 2001), or that result "from attempted compliance with government regulation."  <u>American Hospital Ass'n v. Harris</u>, 625 F.2d 1328, 1331 (7th Cir. 1980).

Furthermore, Hawthorn has maintained at least 12 of the original 16 elephants under this agreement since March of 2004.  Thus, Hawthorn has failed to explain how requiring it to maintain four elephants for an additional two months, or other reasonable period of time, after Hawthorn has already maintained at least 12 elephants for <u>over a year</u>, could result in irreparable harm.  Moreover, according to Mr. Cuneo it costs approximately $10,000 per month to care for all 12 elephants, therefore it would cost approximately <u>$ 8,400 to pay to care for four elephants for two and a half months</u>.  Cuneo Decl. ¶ 24 (Interv. Exh. 3).  These claimed "injuries, however

25

substantial, in terms of money, time and energy necessarily expended" are simply not enough to

demonstrate "irreparable injury."  Carabillo v. ULLICO Inc. Pension Plan and Trust, 355 F.

Supp.2d 49, 54-55 (D.D.C. 2004) (quoting Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d

921, 925 (D.C. Cir.1958); see also Boivin v. U.S. Airways, Inc., 297 F. Supp.2d 110, 118

(D.D.C.2003)).  Particularly, when requiring the defendants and defendant-intervenors to simply

maintain the status quo is well within the Court's equitable authority.  See St. Jude Medical Inc.

v. Carbomedics, 764 F.2d 500, 501 (8th Cir. 1985) (district court may grant a preliminary

injunction and order the defendant to pay the cost of maintaining the *status quo*); [12]

The federal defendants' claims regarding the equities are equally unavailing.  Indeed, they

do not address any of plaintiffs' arguments – in fact, neither Hawthorn nor the USDA even

discuss plaintiffs' concern that these highly social animals will be traumatized by their separation

from the rest of their families.  Remarkably, the USDA asserts that an injunction is not in the

public interest because "Defendant-intervenors have continued to violate the AWA 'in

connection with their handling, husbandry and care of elephants'" and therefore the elephants

should be moved "as expeditiously as possible."  Def. Mem. at 13.  However, rushing these four

elephants from one facility that violates the AWA to another facility that also abuses and

mistreats elephants is certainly not in the public interest.  See Laule Decl. (Plf. Exh. *).

Thus, as plaintiffs explained in their opening brief at 15, the "primary purpose of [the

---

[12] The intervenors' claims of harm from transport re-arrangements and otherwise from plaintiffs' filing suit on the "eve of transportation," Interv. Mem. at 1, are directly contradicted by their statements that their "transportation plan was initially delayed because Oklahoma's State Veterinarian raised concerns about possible tuberculosis," id. at 9, and that "[d]iscussions still remain underway with the relevant Oklahoma authorities to resolve outstanding health concerns." Id. at 10, n. 11.

AWA] is to ensure the humane care and treatment of various animals used in research or for exhibition . . ..” <u>ALDF v. Glickman</u>, 154 F.3d at 438.  Therefore, the public has a strong interest in ensuring that the USDA carries out its duties under that statute in a way that advances, rather than defeats, the objectives of that statute.  <u>See also</u> <u>Clark</u>, 27 F. Supp. 2d at 15 (public interest would be served by requiring federal agency to comply with the law); <u>Patriot v. U.S. Dep’t of Housing and Urban Dev’t</u>, 963 F. Supp. 1, 6 (D.D.C. 1997) (“the public interest is best served by having federal agencies comply with the requirements of federal law”).  These elephants have led lives wrought with abuse and mistreatment.  Thus, it is hard to understand how the public interest could favor placement of these animals at a facility that uses the techniques illustrated in the DVD, Plf. Exh. A, and described in the investigator’s affadavit to USDA, Plf. Exh. *, versus life at The Elephant Sanctuary:  <<u>www.tappedintoelephants.com/ram/tes_info.ram></u>, or any other facility that will truly serve as a refuge for these much deserving elephants.

Respectfully submitted,

_____

Tanya M. Sanerib
(D.C. Bar No. 473506)
Katherine A. Meyer
(D.C. Bar No. 244301)

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206
June 16, 2005                    Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEBRA LYNN LEAHY, <u>et al</u>. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. 05-1135 (PLF) |
| ) | |
| THE UNITED STATES DEPARTMENT OF ) | |
| AGRICULTURE, <u>et al.</u> ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE HAWTHORN CORPORATION and JOHN F. ) | |
| CUNEO, ) | |
| ) | |
| Defendant -Intervenors. ) | |

## **PROPOSED ORDER**

Upon consideration of plaintiffs' motion for a temporary restraining order / preliminary injunction, and the responses thereto, it is this _____ day of _____, 2005

ORDERED that the motion for a temporary restraining order /preliminary injunction is granted, and further

ORDERED that the decision by the United States Department of Agriculture's decision to approve the transfer of elephants from the Hawthorn Corporation in Illinois to a Carson & Barnes' facility in Oklahoma is hereby temporarily declared unlawful and set aside, and further

ORDERED that defendant-intervenors are enjoined from moving any of their elephants to Carson & Barnes' Endangered Ark Foundation until further order of the Court.

_____
United States District Judge